RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0285p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TIMOTHY LANDIS, O.D.,

        *Plaintiff-Appellant,*

    *v.*

PINNACLE EYE CARE, LLC, dba VisionFirst; JOHN
M. SCHMITT; LOUISVILLE OPTOMETRIC CENTERS III,
INC., Successor-in-Interest to Louisville Optometric
Centers II, Inc.; ROD RALLO,

        *Defendants-Appellees.*

No. 07-6204

>

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 06-00569—Charles R. Simpson III, District Judge.

Argued: June 11, 2008

Decided and Filed: August 11, 2008

Before: SILER and COLE, Circuit Judges; CLELAND, District Judge.[*]

---

## COUNSEL

**ARGUED:** Edward Brian Davis, DAVIS LAW OFFICE, Louisville, Kentucky, for Appellant.
Edward J. Smith, SMITH, GREENBERG & NAPIER, PLLC, Louisville, Kentucky, for Appellees.
**ON BRIEF:** Myrle L. Davis, KRUGER, SCHWARTZ & MORREAU, Louisville, Kentucky, for
Appellant. Edward J. Smith, SMITH, GREENBERG & NAPIER, PLLC, Louisville, Kentucky, for
Appellees.

      SILER, J., delivered the opinion of the court, in which CLELAND, D. J., joined. COLE, J.
(pp. 6-7), delivered a separate concurring opinion.

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting
by designation.

1

---

## OPINION

---

SILER, Circuit Judge. Dr. Timothy Landis, O.D., brought suit against Pinnacle Eye Care, LLC, dba VisionFirst, John Schmitt, Louisville Optometric Centers III, Inc., successor to Louisville Optometric Centers II, Inc., and Rod Rallo (collectively "Defendants"), alleging employment discrimination based on his military service and his age. The district court granted the Defendants' motion to stay the suit and ordered the matter to arbitration. Landis now appeals. We AFFIRM.

### I. Background

In 1995, Louisville Optometric Centers II ("LOC II") hired Landis as an optometrist. Landis signed an employment agreement with LOC II. In Article VII of the employment agreement, he agreed to "resolve any controversy, dispute or disagreement arising out of or relating to [the] Agreement" through negotiation or, if negotiation proved unsuccessful, through arbitration governed by the American Arbitration Association.[1]  In 1999, LOC II was succeeded by Louisville Optometric Centers III ("LOC III"). Landis executed another employment agreement with LOC III that was identical in all material respects, including the arbitration clause.

Rallo was LOC's primary doctor of optometry throughout this time period. Schmitt worked for LOC as a manager. In 2002, Rallo formed a new management company, Pinnacle Eye Care, LLC. Since 2002, Rallo has directed LOC officers under the management of Pinnacle Eye Care. These companies do business as VisionFirst, which is not registered as a separate business entity.

In April 2004, Landis was ordered to report for duty in Afghanistan as a member of the Indiana National Guard. He claimed that he negotiated his employment upon return with Schmitt before leaving for Afghanistan, but the employment agreement was not amended to include these alleged terms. Landis claimed that the terms were as follows: during deployment in Afghanistan, VisionFirst would preserve his Hodgenville, Kentucky, practice by hiring additional optometrists to care for his patients, VisionFirst would deduct three percent of the gross earnings of the Hodgenville office from his overdraw debt to LOC when he returned, and VisionFirst would make his last draw payment on May 10, 2004. He alleged that upon his return from Afghanistan, Schmitt refused to honor these terms and VisionFirst demoted him and threatened that any further involvement with the military would adversely affect his career.

In 2006, Landis filed suit, alleging (1) employment discrimination based on military service in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301-4334 ("USERRA"), and Ky. Rev. Stat. § 38.238; (2) age discrimination in violation of Ky. Rev. Stat. § 344.040; and (3) unlicensed practice of optometry by Schmitt and VisionFirst in violation of Ky. Rev. Stat. § 320.300. Specifically, Landis alleged that VisionFirst ordered a stop

---

[1] The full text reads:

> Practice and Optometrist shall negotiate in good faith to resolve any controversy, dispute, or disagreement arising out of or relating to this Agreement or the breach of any provision of this Agreement. Any matter not resolved by negotiation shall be settled (a) first, by the parties trying in good faith to settle the dispute by mediation under the Commercial Mediation Rules of the American Arbitration Association ("AAA") (such mediation session to be held in Chicago, Illinois and to commence within fifteen (15) days of the appointment of the mediator by the AAA), and (b) if the controversy, claim, or dispute cannot be settled by mediation, then by arbitration administered by the AAA under its Commercial Arbitration Rules (such arbitration to be held in Chicago, Illinois before a single arbitrator and to commence within fifteen (15) days of the appointment of the arbitrator by the AAA), and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

payment on his May 10, 2004 draw payment, that it had sent fill-in doctors to his practice for two days a week instead of the promised three, and that it did not apply the three percent of the gross earnings of the Hodgenville office as a credit against his overdraw debt to LOC III.

The district court granted Defendants' motion to stay the matter and order it to arbitration. It held that (1) Landis's claims were within the scope of the employment agreement, (2) USERRA did not preempt the arbitration clause, (3) the claims against some appellees who were not parties to the employment agreement should be arbitrated, and (4) the claims against VisionFirst and Schmitt were not properly before a federal court.

## II. Discussion

We review de novo a district court's decision to compel arbitration. *Bratt Enters., Inc. v. Noble Intern., Inc.*, 338 F.3d 609, 612 (6th Cir. 2003). We must determine whether the dispute is arbitrable, meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of the agreement. *Id.*

### *Scope of the Employment Agreement and Claims Against Other Parties*

The claims in Landis's complaint fall within the scope of the employment agreement since Article VIII, Section 8.7 of the agreement states that "[t]his Agreement constitutes the *entire agreement* between Practice and Optometrist pertaining to *the employment relationship* between Practice and Optometrist." Therefore, any termination or modification of employment necessarily relates to "the employment relationship" and is subject to the arbitration clause.

The district court correctly held that the claims against Rallo, Schmitt, and Pinnacle Eye Care were subject to the arbitration clause of the employment agreement. These parties were employers within the meaning of USERRA, 38 U.S.C. § 4303(4)(A), and the claims against them arose in their capacities as managers of LOC offices.

### *Arbitrability of USERRA Claims*

Federal law favors arbitration. Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"). While the Supreme Court has not addressed the arbitrability of USERRA claims, it has repeatedly held that statutory claims are arbitrable. District courts are divided on the arbitrability of USERRA claims, but the only court of appeals to address the question, the Fifth Circuit, held that USERRA claims are arbitrable.

In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 23 (1991), the Court concluded that an age discrimination claim brought pursuant to the Age Discrimination Act of 1967 can be subjected to compulsory arbitration. Statutory claims "may be the subject of an arbitration agreement, enforceable pursuant to the FAA." *Id.* at 26. The Court held enforceable arbitration agreements relating to claims arising under the Sherman Act, § 10(b) of the Securities Exchange Act of 1934, the civil provisions of the Racketeer Influenced and Corrupt Organizations Act, and § 12(2) of the Securities Act of 1933. *Id.* "Although all statutory claims may not be appropriate for arbitration, having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* (internal quotations and alteration omitted). The burden is on the party opposing arbitration to show that Congress intended to preclude a waiver of a judicial forum for the particular claim. *Id.* If such an intention exists, it will be discoverable (1) in the text of the statute, (2) the legislative history, or (3) an inherent conflict between arbitration and the statute's purposes. *Id.* All "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Id.*

*Garrett v. Circuit City Stores, Inc.*, 449 F.3d 672, 674-75 (5th Cir. 2006) held that USERRA claims are arbitrable. Garrett alleged that he was fired from his job at Circuit City as the American military was preparing for combat in Iraq because of his supervisors' hostility toward his status as a reservist. *Id*. at 674. The arbitration agreement between Garrett and Circuit City provided that claims arising out of cessation of employment would be settled by final and binding arbitration, enforceable by and subject to the FAA. *Id.*

Relying heavily on *Gilmer*, the Fifth Circuit concluded that USERRA claims are arbitrable. *Id*. at 674-75. First, nothing in the statutory language of USERRA demonstrated a Congressional intent to preclude arbitration. *Id*. at 677. The court rejected the argument that USERRA § 4302(b) precludes arbitration. *Id*. at 676. This section reads:

> This chapter supersedes any State law . . . contract, agreement, policy, plan, practice or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by this chapter, including the establishment of additional prerequisites to the exercise of any such right or receipt of any such benefit.

*Id.* (quoting 38 U.S.C. § 4302(b)). By agreeing to arbitration, a party does not forego the substantive rights provided by the statute, but rather it submits its claims to an arbitral forum instead of a judicial forum. *Id*. at 677. Nothing in § 4302(b) mentions mandatory arbitration or the FAA, notwithstanding the *Gilmer* decision issued three years before the enactment of § 4302(b). *Id*. Congress was presumptively aware of *Gilmer* but chose not to include text exempting USERRA from the policy favoring arbitration. *Id.*

Second, the legislative history of USERRA does not prevent arbitrability of claims. *Id*. at 680. Garrett argued that a portion of the 1994 legislative history of § 4302(b) from the House Committee Report confirmed Congressional intent to forbid binding arbitration.[2] *Id*. at 679. After noting "a powerful line of Supreme Court authority [suggesting] that legislative history should rarely be used in statutory interpretation," the court stated that the text of USERRA was unambiguous, rendering resort to legislative history unnecessary. *Id*. It also noted that there was no comparable report from the Senate, no mention of *Gilmer*, and the totality of the circumstances supported the conclusion that "Congress intended § 4302(b) only to prohibit the limiting of USERRA's substantive rights by union contracts and collective bargaining agreements, and that Congress did not refer to arbitration agreements between an employer and individual employee." *Id*. at 679-80.

Third, there is no inherent conflict between arbitration and USERRA's underlying structure and purposes. *Id*. at 680. The grant of administrative and enforcement authority to the Department of Labor and the Attorney General did not conflict with arbitration. *Id*. In *Gilmer*, the Court rejected the plaintiff's argument that the Equal Employment Opportunity Commission's authority and role in the enforcement of the ADEA precluded arbitration. *Id*. "The same reasoning applies to USERRA, which, like the ADEA and Title VII, affords both civil actions by the agency and private actions by an employee." *Id*. at 680-81. "Even if Garrett had chosen to involve the Attorney

---

[2] The relevant text of the House Committee Report reads:

> Section 4302(b) would reaffirm a general preemption as to State and local laws and ordinances, as well as to employer practices and agreements, which provide fewer rights or otherwise limit rights provided under amended chapter 43 or put additional conditions on those rights. [Several federal court decisions] provide that no employer practice or agreement can reduce, limit or eliminate any right under chapter 43. Moreover, this section would reaffirm that additional resort to mechanisms such as grievance procedures or arbitration or similar administrative appeals is not required. It is the Committee's intent that, even if a person protected under the Act resorts to arbitration, any arbitration decision shall not be binding as a matter of law.

*Id*. at 679 (internal citations omitted) (quoting H.R. Rep. No. 103-65, 1994, *as reprinted in* 1994 U.S.C.C.A.N. 2453.4.).

General . . . nothing in [USERRA] suggests that the Attorney General would not have been able to represent Garrett in arbitration." *Id*. at 681. Arbitration presents a fair opportunity for a claimant to present and prevail on a claim of a USERRA violation. *Id*. at 681.

Several district courts have agreed with *Garrett* and held USERRA claims arbitrable, *see, e.g.*, *Kitts v. Menards, Inc.*, 519 F. Supp. 2d 837, 844 (N.D. Ind. 2007), while others have not. In *Breletic v. Caci, Inc.-Federal*, 413 F. Supp. 2d 1329 (N.D. Ga. 2006), the district court held that USERRA granted a plaintiff the right to pursue a USERRA claim in a judicial forum and preempted an arbitration agreement covering claims arising under USERRA. *Id*. at 1336-37. In *Lopez v. Dillards, Inc.*, 382 F. Supp. 2d 1245 (D. Kan. 2005), the district court held that USERRA superseded an arbitration agreement between an employee and employer. *Id*. at 1249.

Here, the district court properly rejected *Breletic* and *Lopez*. We will not follow *Breletic* because there is no ambiguity in the text of USERRA regarding preemption of arbitration agreements. We will not follow *Lopez* because it characterizes arbitration as a "prerequisite" to the exercise of substantive rights. 382 F. Supp. 2d at 1248-49. The Supreme Court, however, does not characterize arbitration as such. *Gilmer*, 500 U.S. at 26. We find *Garrett* persuasive because it properly applied *Gilmer*. USERRA claims are arbitrable.

### Supplemental Jurisdiction Over Unlicensed Practice of Optometry Claim

The district court properly determined that it lacked supplemental jurisdiction over Landis's claim that Schmitt and VisionFirst practiced optometry without a license. This claim was based solely on state law and Landis conceded that the only basis for jurisdiction over these claims would be supplemental jurisdiction. Because the district court determined that it lacked jurisdiction over any of the federal claims due to the arbitration clause in the employment agreement, there was no claim properly before the district court to which this state law claim could attach.

AFFIRMED.

———————————————

## CONCURRENCE

———————————————

COLE, Circuit Judge, concurring.  While this is a close case, I ultimately believe that my colleagues have come to the right conclusion—that Section 4302(b) of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4302(b), is not a clear expression of congressional intent to preclude the arbitration of servicemembers' employment disputes.  I write separately only to acknowledge the odd result this holding produces and to encourage Congress, when this issue comes up again, to be a bit more clear.

Section 4302(b) states, in part, that "[t]his chapter supersedes any . . . contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by this chapter, including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit." *Id.*  I agree that the first clause of this provision—"reduces, limits, or eliminates in any manner any right or benefit provided by this chapter"— should be interpreted as relating to the substantive terms and conditions of employment, not the procedures used to resolve such disputes.  "By agreeing to arbitrate a statutory claim," the Supreme Court has told us, "a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 615, 628 (1985).

But the latter clause, which precludes "the establishment of additional prerequisites," gives me some cause for concern.  By "additional prerequisites," Congress clearly meant to stop employers from requiring "additional resort to mechanisms such as grievance procedures or arbitration or similar administrative appeals." H.R. Rep. No. 103-65, at 20 (citations omitted).  And if there is any residual doubt as to whether Congress meant to include arbitration as an "additional prerequisite," the House Committee Report explained that "[i]t is the Committee's intent that, even if a person protected under the Act resorts to arbitration, any arbitration decision shall not be binding as a matter of law." *Id.*

So what is the end result?  Section 4302(b) precludes an employer from requiring an employee to submit to arbitration, mediation, or any grievance procedure as a *prerequisite* to filing suit in federal court.  I presume that, in so doing, Congress intended employees, not employers, to dictate the method or forum in which they pursue their rights under USERRA.  But now, if an employee's contract requires him or her to *substitute* federal court with arbitration, the employee has no choice but to do so.  In other words, if Landis's contract required him to arbitrate any employment dispute under USERRA before bringing suit in federal court, Section 4302(b) expresses an opinion that such an arbitration would be hostile to USERRA's underlying structure and purpose.  Yet if Landis's contract requires him to waive his right to federal court altogether, we must defer to the strong federal policy favoring arbitration. *Mitsubishi*, 473 U.S. at 626-27.

Unfortunately, this incongruous result is what the plain language of Section 4302(b) tells us.  Congress may not have intended members of our armed forces to submit to binding, coercive arbitration agreements—indeed, I think quite the opposite—but nothing in the text of the USERRA, or its legislative history, evinces a clear intent to preclude a waiver of judicial remedies for the statutory rights at issue.  I acknowledge that we have moved beyond the yesteryears of skepticism, mistrust, and even hostility toward arbitration agreements. *See Gilmer v. Interstate/Johnson Lane Corp*, 500 U.S. 20, 24 (1991) (acknowledging that the FAA was enacted "to reverse the long-standing judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts").  But with a growing number of employers turning to pre-dispute and pre-packaged mandatory arbitration agreements to limit the ability of their employees to bring

their statutory claims in federal court, and with the Supreme Court enforcing those provisions, *see id.* at 26, if Congress intends to preclude arbitration as a substitute for a judicial forum in the future, I encourage it to do so with language that is unmistakably clear.