RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0040p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOHN G. MCMILLAN,

        *Plaintiff-Appellant,*

    *v.*

LTV STEEL, INC.,

        *Defendant-Appellee.*

No. 07-4370

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-00850—Sara E. Lioi, District Judge.

Argued: December 4, 2008

Decided and Filed: February 5, 2009

Before: CLAY and GIBBONS, Circuit Judges; STAMP, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Alexander Morris Spater, SPATER LAW OFFICE, Columbus, Ohio, for
Appellant. Kathleen B. Burke, JONES DAY, Cleveland, Ohio, for Appellee.
**ON BRIEF:** Alexander Morris Spater, SPATER LAW OFFICE, Columbus, Ohio,
Solvita A. McMillan, LAW OFFICE, Lakewood, Ohio, for Appellant. Kathleen B.
Burke, JONES DAY, Cleveland, Ohio, Nicholas M. Miller, DLA PIPER, Chicago,
Illinois, for Appellee.

_____

## OPINION

_____

    CLAY, Circuit Judge. John G. McMillan appeals the district court's judgment
upholding the bankruptcy court's denial of McMillan's claim seeking administrative

---

    [*]The Honorable Frederick P. Stamp, Jr., United States District Judge for the Northern District of
West Virginia, sitting by designation.

expense priority status for amounts allegedly owed to him by his former employer, LTV Steel, Inc. ("LTV Steel"), a debtor in Chapter 11 bankruptcy proceedings. The bankruptcy court sustained LTV Steel's objection to McMillan's administrative expense claims, and denied McMillan's claims. The district court affirmed, concluding that the bankruptcy court properly sustained LTV Steel's objection, and that the bankruptcy court did not err in denying McMillan's motion for reconsideration. For the reasons set forth below, we **AFFIRM** the order of the district court affirming the bankruptcy court's denial of McMillan's administrative expense claim.

## I.     BACKGROUND

### A.     Employment History and Benefits

John G. McMillan worked at LTV Steel's Cleveland Works West plant ("Cleveland West") in Cleveland, Ohio as an hourly employee for over thirty years. While employed at LTV Steel, McMillan was a member of the collective bargaining unit represented by the United Steelworkers of America, AFL-CIO (the "USWA"). The USWA and LTV Steel negotiated a labor and benefit agreement that provided various benefits to employees, including pension benefits. As an employee of LTV Steel, McMillan was covered by both the Defined Contribution Pension Agreement and the Defined Benefit Agreement. The Defined Benefit Agreement provided "basic" pension benefits. An employee's account under the Defined Contribution Pension Agreement consisted of a Company Contribution Account, to which the employer contributed certain amounts based on an hourly rate, and an Elective Contribution Account—the employee's 401(k) plan—to which the employee contributed.

On August 1, 1999, the USWA and LTV Steel entered into an agreement (the "1999 Agreement") restructuring the pension benefits for all qualified employees. The 1999 Agreement provided that "[i]ndividual Company Contribution Accounts . . . will be transferred into the defined benefit pension plan, invested with the [defined benefit] assets, and at retirement the [Defined Contribution Plan] annuities [will be] paid from the [Defined Benefit] plan . . . ." (J.A. 323.) The 1999 Agreement eliminated future

company contributions to the pension plan, and preserved the 401(k) contributions to the plan, as well as the right of employees to receive a lump-sum payment from the Defined Benefit plan upon retirement, subject to a $10,000 cap.

### B.    LTV Steel's Financial Difficulties

On December 29, 2000, LTV Steel, Copperweld, LTV Corporation—the parent company of both Copperweld and LTV Steel—and numerous LTV affiliates filed voluntary petitions for Chapter 11 bankruptcy. Subsequently, on April 16, 2001, LTV Steel issued a notice pursuant to the Worker Adjustment and Retraining Notification Act ("WARN Act")[1] to the USWA regarding the planned closing of Cleveland West and resulting mass layoffs. On July 30, 2001, the bankruptcy court approved a modified labor agreement ("MLA") entered into by LTV Steel and the USWA. The MLA, which the USWA's membership ratified, rescinded the April 2001 WARN notice. LTV Steel, however, never reopened the Cleveland West plant. Following the closing of Cleveland West, McMillan accepted work at other LTV facilities which, in at least one instance, involved a reduced rate of pay, in order to avoid layoff. Despite his efforts to remain employed, McMillan was laid off on August 25, 2001, and never returned to work.

In a letter dated November 13, 2001, McMillan and other employees at the Cleveland West plant received notification of LTV Steel's intention to permanently shut down Cleveland West. The letter informed the employees that, under the terms of the MLA, they could exercise one of four options associated with the permanent shutdown: (1) accept a severance allowance; (2) accept pension options and agree to terminate employment with LTV Steel no later than November 30, 2001; (3) transfer permanently to the East Side Plant, which would result in a new date of continuous service[2] of August 1, 2001; or (4) remain on layoff. LTV Steel requested that the employees return the

---

[1] The WARN Act requires certain employers to provide a written notice sixty days in advance of a plant closing or mass layoff. 29 U.S.C. § 2102(a).

[2] McMillan notes in his brief that, if he had elected to transfer to the East Side Plant, he would have relinquished his thirty-one years of seniority by accepting a new continuous-service date, which is used to determine seniority. Thus, because under the collective bargaining agreement employees were called back to work based on seniority, transferring to the East Side Plant would have placed him near the bottom of the call-back list.

Irrevocable Election Form no later than November 23, 2001. On December 11, 2001, McMillan elected to retire with pension benefits, and received a $10,000 lump-sum payment.[3]

In an attempt to secure the funds necessary to continue its operations, LTV Steel sought a $250 million loan under the Federal Emergency Loan Guarantee Program. Receipt of the loan depended on LTV Steel obtaining wage and benefit concessions from the USWA, but negotiations regarding concessions broke down on November 19, 2001. As a result, the Federal Loan Guarantee Board refused to grant preliminary approval of the loan, and LTV Steel decided to cease operations due to a lack of funds. On November 20, 2001, LTV Steel issued a WARN notice, informing LTV Steel employees that it was terminating all steelmaking operations and eliminating all hourly jobs. LTV Steel also sought approval of an Asset Protection Plan in the bankruptcy court permitting the sale of substantially all of LTV Steel's assets outside of the ordinary course of business. On December 7, 2001, the bankruptcy court approved the Asset Protection Plan and, as proposed, LTV Steel sold its assets. Although the proceeds from the sale were sufficient to satisfy the debts owed to secured creditors, LTV Steel remained unable to pay the administrative and other unsecured claims against its estate. Accordingly, LTV Steel declared itself administratively insolvent and therefore unable to confirm a plan of reorganization. *See* 11 U.S.C. § 1129(a)(9)(A) (providing that full payment of administrative expenses is a prerequisite to confirmation of a reorganization plan).

In addition to declaring itself administratively insolvent, LTV Steel also was unable to fund the payments as required under the terms of the Defined Benefit Plan. As a result, the Pension Benefit Guaranty Corporation ("PBGC") terminated the Defined Benefit Plan and assumed "all of the rights and powers of a trustee specified . . . , or otherwise granted by law," beginning March 31, 2002. (J.A. 390.) PBGC continues to administer the unpaid benefits of McMillan and other LTV Steel retirees.

---

[3]The parties do not dispute that McMillan retired on this date, or that his election was effective despite his late return of the election form.

On December 20, 2001, LTV Steel and the USWA agreed to modify numerous aspects of preexisting agreements, effective December 19, 2001. Among other modifications, the parties agreed that LTV Steel's obligations under "any and all of the collective bargaining agreements, including any benefit programs, . . . shall be modified" to provide that "[t]he provisions on Severance Allowance" would "no longer be in effect for Employees at Basic Steel Facilities," including employees at the Cleveland West plant. (J.A. 1170, 1174.)

## C.    The USWA's Claims

On June 27, 2002, the USWA filed a proof of claim for administrative expenses against LTV Steel's estate. The proof of claim stated that "Debtors," including LTV Steel, had failed to fulfill their obligations to the USWA, including the obligation to pay severance, to pay amounts resulting from WARN Act liability, and to contribute to retiree benefits. LTV Steel and its affiliates settled the USWA's administrative expense claim and, on December 16, 2003, the bankruptcy court entered a stipulation and order embodying the parties' settlement (the "2003 Stipulation"). The 2003 Stipulation provided that the USWA's claim "shall be allowed as an administrative expense claim against the estate of LTV Steel in the amount of $15 [million] in full satisfaction of that claim." (J.A. 706.) In addition, the 2003 Stipulation directed LTV Steel to make pro rata payments to "all of the former LTV Steel employees listed on Exhibit A . . . , such that each [e]mployee receives an equal gross amount of any distributions" stemming from the USWA's administrative expense claim. (J.A. 706.) The 2003 Stipulation explicitly noted that the list of employees "in the attached Exhibit A excludes those on layoff from the Cleveland West operation (on behalf of whom WARN notice was given at an earlier time) and all other employees on layoff on or before November 20, 2001." (J.A. 706.) In exchange for its allowed administrative expense claim and LTV Steel's pro rata payments to LTV Steel employees, the USWA

> irrevocably and unconditionally release[d] . . . the LTV Parties . . . from any and all claims (including any proofs of claim or administrative claims asserted against any of the LTV Parties' estates) . . . , and any causes of action of any kind or nature . . . , including, but not limited to, claims arising from any

relationship, contract, agreement, . . . or other connection between the USWA and the LTV Parties . . . .

(J.A. 708.)

Because McMillan was laid off on August 25, 2001 and never returned to work, McMillan was not included among "all former hourly LTV Steel employees who were actively employed and working at certain of LTV Steel's facilities on November 20, 2001" listed in Exhibit A. (J.A. 706.) As a result, under the terms of the 2003 Stipulation, McMillan was not entitled to receive any of the pro rata payments. The USWA did not direct LTV Steel to provide McMillan with notice of the 2003 Stipulation, and neither McMillan nor his attorney were provided with direct notice of the 2003 Stipulation.

**D.     Copperweld Settlement**

On December 3, 2002, McMillan filed a proof of claim with the bankruptcy court. McMillan asserted a general unsecured claim in the amount of $317,293.81 against LTV Steel, LTV Corporation, and Copperweld. McMillan claimed entitlement to wages and employee benefits, including $33,708.62 from his Defined Contribution Pension Plan account. Debtors, including LTV Corporation, Copperweld, and LTV Steel, objected to McMillan's claim, arguing that the claim was improper as to Copperweld and LTV Corporation and that McMillan could assert his claim against only LTV Steel. The bankruptcy court sustained the objection, noting that there was "no evidence" that LTV Steel, LTV Corporation, and Copperweld "operated as an integrated enterprise" as McMillan had claimed. (J.A. 907-08.) McMillan appealed the bankruptcy court's ruling.

Before the bankruptcy court ruled on the appeal, however, McMillan settled with Copperweld. The settlement agreement (the "Copperweld Settlement") allowed McMillan an unsecured priority claim totaling $4,650.00 and a general unsecured claim

in the amount of $312,643.81.**4** The Copperweld Settlement provided that Copperweld's "[p]ayment of the settlement amount shall constitute full satisfaction of any and all liabilities" with respect to McMillan's claims. (J.A. 715.) McMillan also agreed to release all claims against Copperweld, but did not waive "any claim . . . against LTV Steel Company, Inc. or LTV Corporation." (J.A. 715-16.) Pursuant to the terms of the Copperweld Settlement, McMillan filed a motion to dismiss his appeal. The bankruptcy court granted the motion, and dismissed McMillan's appeal on October 29, 2004. In its order of dismissal, the bankruptcy court explicitly stated that the dismissal of the appeal "shall not affect in any manner [McMillan's] ability to seek relief against the LTV Steel Company, Inc."

### E.    McMillan's Administrative Claim

In 2004, McMillan sought and the bankruptcy court granted leave to file an administrative expense claim against LTV Steel in the amount of $42,596.62. McMillan's claim, which is the subject of this appeal, consisted of three components: (1) $33,708.62 representing the unpaid balance in his Defined Contribution Pension Plan account ("DCP component"); (2) $7,888 in unpaid severance benefits ("Severance component"); and (3) $1,000 in backpay, to which McMillan claims he is entitled under the WARN Act ("WARN Act component"). McMillan asserted that each component of his claim constituted an administrative expense as defined in 11 U.S.C. § 503(a). LTV Steel objected to the claim. On January 6, 2006, the bankruptcy court sustained LTV Steel's objections and denied McMillan's administrative expense claim.

On January 17, 2006, McMillan filed a motion to amend and supplement the bankruptcy court's findings and a motion for reconsideration of the bankruptcy court's order of January 6, 2006. The bankruptcy court considered McMillan's motion as a Rule 59(e) motion to amend or alter the judgment and a motion for reconsideration of the

---

**4**Copperweld was able to restructure its debts and continue operations. On November 7, 2003, the bankruptcy court confirmed Copperweld's plan of reorganization. The settlement agreement provided that Copperweld would make payments to McMillan pursuant to the plan of reorganization.

disallowance of a claim under 11 U.S.C. § 502(j).  After concluding that McMillan failed to meet his burden, the bankruptcy court denied McMillan's motions in their entirety.

McMillan appealed to the district court, arguing that the bankruptcy court inappropriately denied his administrative expense claim.[5]  McMillan contended that the bankruptcy court failed to consider the fact that the balance in his DCP account "vested" prior to the 1999 Agreement, which he argued entitled him to the value of the funds in DCP account just prior to the 1999 Agreement.  McMillan also argued that the bankruptcy court erred in denying his motion to reconsider.  The district court rejected McMillan's arguments, concluding that he had failed to establish that the various components of his claims were entitled to treatment as administrative expenses under 11 U.S.C. § 503(b).  McMillan appealed.

## II.     MCMILLAN'S CLAIM FOR ADMINISTRATIVE EXPENSES

### A.     Standard of Review

On appeal from a district court's judgment affirming an order of the bankruptcy court, this Court reviews the bankruptcy court's order directly, and gives no deference to the district court's decision.  *In re Hamilton*, 540 F.3d 367, 371 (6th Cir. 2008).  This Court reviews the bankruptcy court's findings of fact for clear error, "asking only whether [this Court is] left with a definite and firm conviction that a mistake has been committed."  *Id.*  The bankruptcy court's legal conclusions are reviewed *de novo*. *Phar-Mor, Inc. v. McKesson Corp.*, 534 F.3d 502, 504 (6th Cir. 2008).

---

[5]As the district court noted, McMillan argued that the bankruptcy court erred in determining that "the DCP Component of his claim was: (a) barred as duplicative of a portion of his general unsecured claim; (b) fully satisfied and dismissed with prejudice as a result of the Copperweld Settlement; and[] (c) not entitled to administrative expense status."  McMillan also asserted that the bankruptcy court erroneously determined that the Severance and WARN Act Components of his claim were "released pursuant to terms of the Stipulation and Order reached by [LTV Steel] and the USWA."  (J.A. 8.)

**B.     Analysis**

McMillan argues that the bankruptcy court improperly denied his administrative expense claim when it sustained LTV Steel's objections to his claim. McMillan further contends that the bankruptcy court erred in concluding his administrative expense claim was barred by the 2003 Stipulation between LTV Steel and the USWA, and also by the Copperweld Settlement.

**1.      DCP Component**

In addressing McMillan's arguments, the bankruptcy court framed the issue as "whether McMillan has met his burden of proving his entitlement to an allowance of an administrative claim," and set forth the applicable law. (J.A. 256-57.) The bankruptcy court's analysis, however, focused on other grounds for disallowing McMillan's claim. The bankruptcy court concluded that the 1999 Agreement between LTV Steel and the USWA regarding revisions to the structure of employees' pension benefits "released" the DCP component of McMillan's claim. The 1999 Agreement provided that employees' DCP accounts would be transferred to Defined Benefit accounts, which the PBGC now administers. As a result, the bankruptcy court found that McMillan could not assert a claim against LTV Steel, but had recourse only against the PBGC.

As an alternative basis for its conclusion, the bankruptcy court determined that the Copperweld Settlement, which allowed McMillan a $312,643.81 general unsecured claim to be distributed in accordance with Copperweld's plan of reorganization, satisfied the DCP component of McMillan's claim. The bankruptcy court further concluded that a portion of the DCP component was duplicative of a portion of the general unsecured claim that McMillan previously asserted against LTV Steel, Copperweld, and LTV Corporation and, accordingly, was barred by collateral estoppel.

a.       *Administrative Expense Priority Status*

The Bankruptcy Code assigns priority to certain administrative expenses, including "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). Under the Bankruptcy Code, administrative expenses are "entitled to priority over prepetition unsecured claims." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5 (2000) (citing 11 U.S.C. §§ 507(a)(1), 726(a)(1), 1129(a)(9)(A)).

This Court applies a two-part test to determine whether a claim is entitled to administrative expense priority status under § 503(b). A debt constitutes an actual, necessary administrative expense "'only if (1) it arose from a transaction with the bankruptcy estate and (2) [it] directly and substantially benefitted the estate.'" *In re Eagle-Picher Indus., Inc.*, 447 F.3d 461, 464 (6th Cir. 2006) (quoting *Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 816 (6th Cir. 1997)). Thus, a debt must arise after the debtor files for bankruptcy—"post-petition[—]in order to be accorded administrative expense priority." *In re Sunarhauserman, Inc.*, 126 F.3d at 817. McMillan, as the claimant, has the burden of proving that his claim constitutes an administrative expense. *E.g.*, *In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir. 1987) (noting that "a claimant must prove" that the debt arose post-petition, and that the debt directly and substantially benefitted the estate).

McMillan argues that the DCP component of his claim—the portion representing retirement benefits he claims remain in a DCP account—is an administrative expense entitled to priority status under § 503(b) and § 507(a). The DCP component of McMillan's administrative expense claim relates to funds he argues he became entitled to prior to August 1, 1999, because his benefits had "vested" prior to that date. Regardless of whether his benefits were "vested," LTV Steel did not file bankruptcy until December 2000. Thus, any liability that LTV Steel might have arose pre-petition and, accordingly, does not constitute an administrative expense. *See In re Sunarhauserman, Inc.*, 126 F.3d at 819.

To avoid this result, McMillan relies on 11 U.S.C. § 1114(e)(2) to argue that his retirement benefits are administrative expenses. We note that McMillan has forfeited this argument by failing to raise it in the courts below. *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 456-57 (6th Cir. 2007). Even if we considered McMillan's argument that § 1114(e)(2) requires the DCP component of his claim to be treated as an administrative expense, McMillan's argument would fail. While § 1114(e)(2) provides that "any payment for retiree benefits" "has the status of an allowed administrative expense," the type of "benefit" involved in McMillan's claim is not a "retiree benefit" within the meaning of § 1114. "Retiree benefits" include only "payments to any . . . person . . . for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program" that is "maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." 11 U.S.C. § 1114(a). While the pension program was "maintained or established . . . by [LTV Steel] prior to filing" its bankruptcy petition, the program does not provide payments for medical, surgical, or hospital-care benefits as required by § 1114(a). Thus, § 1114 does not apply to LTV Steel's benefit program directed at administering pensions. *See Adventure Res., Inc. v. Holland*, 137 F.3d 786, 795 (4th Cir. 1998) (concluding that § 1114 does not apply to a program that "administer[s] only *pension* benefits and noting that § 1114 was passed "in response to a perceived threat to . . . retiree health benefits posed by the bankruptcy reorganization of numerous large employers").

Accordingly, we conclude that McMillan cannot demonstrate that the DCP component of his claim is entitled to priority treatment as an administrative expense.

### b.      *LTV Steel as a Proper Party*

The bankruptcy court denied the DCP component of McMillan's claim because it concluded that the 1999 Agreement transferred the balance of McMillan's Defined Contribution Plan account to a Defined Benefit account. The bankruptcy court found

that, because PBGC now administers LTV Steel's Defined Benefit plan, McMillan has recourse against only PBGC and, thus, his claim against LTV Steel was improper.

The bankruptcy court's findings regarding the effect of the 1999 Agreement are not clearly erroneous. Under the terms of the 1999 Agreement, "[i]ndividual Company Contribution Accounts . . . [were] transferred into the defined benefit pension plan, [and] invested with the [defined benefit] assets." (J.A. 323.) The 1999 Agreement further provides that, "at retirement[,] the DCP annuities [will be] paid from the DB plan . . . ." (J.A. 323.) Such support in the record does not leave this Court with "a definite and firm conviction that a mistake has been committed" and, as a result, we uphold the bankruptcy court's factual findings. *See In re Hamilton*, 540 F.3d at 371. Therefore, we conclude that the bankruptcy court correctly determined that McMillan could assert the DCP component of his claim against only PBGC.

McMillan has failed to satisfy his burden of demonstrating that the DCP component of his claim is an administrative expense and, because PBGC now administers the DB plan, has improperly asserted the DCP component of his claim against LTV Steel. Thus, because these grounds support the bankruptcy court's conclusions, we do not consider McMillan's arguments with respect to the alternative bases for the bankruptcy court's holding with respect to the DCP component.

### 2. Severance Payments and WARN Act Liability

The bankruptcy court concluded that the WARN Act and Severance components of McMillan's claim were "released pursuant to the [2003] Stipulation and Order with the USWA" because the USWA acted as McMillan's agent in negotiating the 2003 Stipulation. (J.A. 260.) McMillan argues that this finding is not supported by the terms of the 2003 Stipulation, and that his due process rights were violated because he did not receive notice of the 2003 Stipulation that purported to waive his right to pursue claims against LTV Steel.

### a.    Effect of the 2003 Stipulation

On appeal, McMillan does not contest that the terms of the 2003 Stipulation "irrevocably and unconditionally release[d] . . . the LTV Parties . . . from any and all claims (including proofs of claim or administrative claims asserted against any of the LTV Parties' estates)." Instead, he maintains that the 2003 Stipulation does not bar *his* claims for two reasons. First, McMillan asserts that the USWA has no right to represent retirees because retirees are not members of the USWA. Therefore, according to McMillan, the 2003 Stipulation does not preclude his administrative expense claim.

McMillan, however, has not argued previously that his status as a retiree precludes the USWA from representing him, or that the USWA was not authorized to represent him. In his argument to the bankruptcy court, McMillan stated that he did not waive his statutory rights "under the WARN Act" because McMillan "cannot be bound by the December 16, 2003 Order absent a '*clear and unmistakable waiver of [his] rights to a judicial forum.*'" (J.A. 275) (alteration in original). McMillan's district court brief also advanced this argument, asserting that McMillan's "WARN Act and severance claims are grounded in statutory rights which the Sixth Circuit has held cannot be released by a union without a clear and unmistakable waiver by the employee." (J.A. 46) (emphasis omitted). He further argued that, "while a union had standing to sue to enforce its members' right to payment of wage claims and claims under the WARN Act, the union does not own its members' wage and WARN claims." (J.A. 46) (emphasis omitted).

With respect to whether the USWA was authorized to represent him with respect to the 2003 Stipulation, the bankruptcy court found that McMillan did not contest that the USWA could represent him.[6] The arguments McMillan points to in his briefs to the bankruptcy and district courts address whether the union had authority to "bargain away" his retirement benefits and do not relate to the 2003 Stipulation. Because McMillan has not raised arguments with respect to whether the USWA could represent him—either

---

[6]The bankruptcy court's order states that "[i]t is undisputed that the USWA was the exclusive bargaining agent of LTV Steel employees, including [McMillan]." (J.A. 259.)

because he was a retiree at the time or because the USWA was not authorized to act on his behalf—McMillan has waived his right to make these arguments on appeal. *NicSand, Inc.*, 507 F.3d at 456-57.

Second, McMillan argues that the 2003 Stipulation does not preclude his claims because he did not provide a "clear and unmistakable waiver" of his WARN Act rights. To support his argument, McMillan relies on a series of cases that address under what conditions a court will conclude that a union member has waived rights to pursue claims in a judicial forum or against the employer. LTV Steel argues that, because none of these cases were decided in the context of bankruptcy proceedings or involved the WARN Act, their holdings are inapplicable to the present case. Specifically, LTV Steel notes that, once an employer declares bankruptcy, a union has authority to negotiate with the employer regarding necessary modifications to a collective bargaining agreement. LTV Steel also argues that the WARN Act authorizes unions to pursue claims on behalf of former employees, authority that unions do not have with respect to other statutory-based claims.

For the first time on appeal, McMillan cites *Cleveland Electric Illuminating Co. v. Utility Workers Union of America*, 440 F.3d 809, 818 (6th Cir. 2006), and *United Steel Workers of America v. Cooper Tire & Rubber Co.*, 474 F.3d 271 (6th Cir. 2007). He argues that *Cleveland Electric* establishes that the USWA was required to obtain his consent to settle any statutory claims he might have had against LTV Steel. This Court has held that, in order to arbitrate a retiree's statutorily granted benefits, a union must obtain the consent of the retiree. *Cleveland Elec.*, 440 F.3d at 818. McMillan, however, did not argue the issue of consent to either the bankruptcy court or the district court. Although he attempts to include the "consent" argument as part of his argument that the USWA's waiver of his statutory rights was ineffective for failure to provide a clear and unmistakable waiver, neither *Cleveland Electric* nor *Cooper Tire* involved the issue of whether the employee provided a "clear and unmistakable waiver." Thus, to the extent he relies on these cases to argue that the union's waiver was invalid for lack of consent, McMillan has forfeited the argument by failing to assert it below. While it would not

be improper to cite these cases to this Court for the first time in support of an argument he previously raised, McMillan cannot use this authority to support a theory not presented to the lower courts. *See B&H Med., LLC v. ABP Admin., Inc.*, 526 F.3d 257, 268 (6th Cir. 2008). Thus, McMillan has forfeited his right to present the consent argument to this Court—the only argument applicable to the Severance component[7] of his claim—and we therefore will address only his "clear and unmistakable waiver" argument as it relates to the WARN Act component.

McMillan argues that *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70 (1998), supports his contention that the waiver in the 2003 Stipulation was ineffective as to his WARN Act claims. In *Wright*, the Court concluded that "a union-negotiated waiver of employees' statutory right to a judicial forum for claims of employment discrimination [under the ADA]" was invalid because there was no evidence of a "clear and unmistakable waiver" by the union members. *Wright*, 525 U.S. at 80. McMillan contends that a waiver of his statutory right to a judicial forum for a WARN Act violation is no different than a waiver of a right to file employment discrimination claims for which the Court in *Wright* required a clear and unmistakable waiver.

McMillan, however, fails to recognize that, under the WARN Act, a union has authority to bring claims alleging a violation of the WARN Act's provisions on behalf of its employee members. There is no equivalent provision under the ADA; only the "person aggrieved" may bring an action under the ADA. *Compare* 29 U.S.C. § 2104(a)(5) ("A person seeking to enforce [WARN Act] liability, including a representative of employees or a unit of local government aggrieved under paragraph (1) or (3), may sue either for such person or for other persons similarly situated . . . ."), *with* 42 U.S.C. § 12188(a)(1) (incorporating 42 U.S.C. § 2000a-3, which provides that "a civil action for . . . relief . . . may be instituted by the person aggrieved. . . ."). Further, the Supreme Court has interpreted § 2104 of the WARN Act as authorizing a union to sue on behalf of aggrieved employees. The Court has noted that, "[s]ince the union is the 'representative of employees . . . aggrieved,' it is a person who may sue on

---

[7]The Severance component of McMillan's claim is not based on a statutory entitlement.

behalf of the 'persons similarly situated' in order to 'enforce such liability.'" *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 549-50 (1996).

In addition, courts have recognized that a union's settlement of WARN Act claims with the employer precludes employees covered by the settlement from later bringing a claim against the employer for WARN Act violations. *E.g.*, *Hardy v. Chicago Hous. Auth.*, 189 F. App'x 510, 513 (7th Cir. 2006) (finding that a settlement agreement, negotiated by the union, between the employer and the union "releas[ing] all claims" against the employer prohibited former employees from later bringing WARN Act suits against the employer). Further, although McMillan was no longer a member of the union at the time the USWA and LTV Steel reached a settlement, the USWA remained his authorized representative for purposes of the WARN Act claims. In *United Food*, for example, the Court found that, under § 2104, the union had authority to bring claims alleging violations of the WARN Act, even though the employees the union represented were no longer employed. *United Food*, 517 U.S. at 549. As LTV Steel recognizes, the "employees . . . aggrieved" almost always will be former employees, because a WARN Act violation results when the employer fails to give sufficient notice before closing a plant or laying off employees, actions that result in employees becoming former employees.

Thus, the USWA's settlement with LTV Steel constituted an effective waiver of McMillan's rights to bring the WARN Act component of his administrative expense claim. The USWA's claim, which it settled with LTV Steel in the 2003 Stipulation, sought repayment of debt, including amounts owed to employees as a result of WARN Act liability and severance payments, "on behalf of itself and present and former employees" of LTV Steel. (J.A. 393.) In its claim, the USWA asserted that the "USWA is and *was* the collective bargaining representative of certain employees of LTV Steel . . . and was a party to collective bargaining agreements with [LTV Steel] covering bargaining unit employees subject to the CBAs *in effect as of the date of filing of [LTV Steel's] Chapter 11 bankruptcy petition on December 29, 2000.*" (J.A. 392) (emphasis

added).  Thus, the bankruptcy court correctly concluded that McMillan was barred from asserting the WARN Act and Severance components of his administrative expense claim.  Because we find that McMillan is barred from asserting these claims, it is unnecessary to address whether the bankruptcy court erred in determining that McMillan was not entitled to receive severance pay, or to determine whether the WARN Act and Severance components are entitled to administrative expense priority status.

          b.       *Due Process*

McMillan also argues that the failure of LTV Steel and the USWA to provide him with notice of the 2003 Stipulation violated his due process rights.  LTV Steel argues in response that McMillan received notice through the USWA, his agent.  The bankruptcy court did not consider this argument.  The district court, however, concluded that McMillan "received adequate notice of the Stipulation and Order through the USWA as a matter of law and, therefore, his due process rights were not violated." (J.A. 25.)

This Court has not addressed whether notice to a union constitutes notice to the employee member.  In the context of an agency relationship, however, "a principal is chargeable with the knowledge of, or notice to, his agent that is received by the agent in the due course of his employment and is related to the matters within his authority." *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 541 (6th Cir. 2000).  Courts have applied the agency concept to the relationship between a union and an employee.  For example, one court concluded that where an arbitral board fails to provide notice of arbitration to employees, but provides the notice to the union representing the employees, the employees' due process rights are not violated.  *See Mitchell v. Cont'l Airlines, Inc.*, 481 F.3d 225, 233 (5th Cir. 2007).

We conclude that providing notice to the USWA constituted notice to McMillan.  Although at the time the USWA received notice McMillan no longer was employed at LTV Steel, the USWA remained his agent for matters relating to the 2003 Stipulation negotiated with LTV Steel.  As noted above, the USWA's claim sought WARN Act liability and severance payments "on behalf of itself and present and former employees"

of LTV Steel. (J.A. 393.) The USWA stated that the "USWA is and *was* the collective bargaining representative of certain employees of LTV Steel . . . and was a party to collective bargaining agreements with [LTV Steel] covering bargaining unit employees subject to the CBAs *in effect as of the date of filing of [LTV Steel's] Chapter 11 bankruptcy petition on December 29, 2000*." (J.A. 392) (emphasis added). Thus, the USWA was acting as the agent of former employees, including McMillan, in negotiating the 2003 Stipulation and, therefore, notice to the USWA constituted notice to McMillan. Accordingly, McMillan's due process rights were not violated.

Because McMillan's arguments that the 2003 Stipulation does not preclude his claims are without merit, the bankruptcy court did not err in finding that the WARN Act and Severance components of McMillan's claim were "released pursuant to the Stipulation and Order with the USWA." Further, the DCP component of McMillan's claim is not entitled to administrative expense priority status. Thus, the bankruptcy court correctly denied McMillan's administrative expense claim against LTV Steel's estate.

## III.    CONCLUSION

We **AFFIRM** the bankruptcy court's order denying McMillan's administrative expense claim.