*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0016p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

CARL L. THOM, JR.,
       *Plaintiff-Appellee/Cross-Appellant,*

       *v.*

AMERICAN STANDARD, INC.,
       *Defendant-Appellant/Cross-Appellee.*

Nos. 09-3507/3508

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 07-00294—Jack Zouhary, District Judge.

Argued: November 16, 2011

Decided and Filed: January 20, 2012

Before: MERRITT, CLAY, and GRIFFIN, Circuit Judges

————————————

## COUNSEL

**ARGUED:** David A. Campbell III, VORYS, SATER, SEYMOUR AND PEASE LLP, Cleveland, Ohio, for Appellant. John D. Franklin, FRANKLIN & GREENFIELD, LLC, Toledo, Ohio, for Appellee. **ON BRIEF:** David A. Campbell III, Charles F. Billington III, VORYS, SATER, SEYMOUR AND PEASE LLP, Cleveland, Ohio, G. Ross Bridgman, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellant. John D. Franklin, FRANKLIN & GREENFIELD, LLC, Toledo, Ohio, for Appellee.

————————————

## OPINION

————————————

MERRITT, Circuit Judge. This is a FMLA employee-discharge case arising from confusion as to when an employee should return to work after his leave. The defendant, American Standard, Inc., appeals the district court's grant of partial summary judgment in favor of the plaintiff, Carl Thom, Jr., on his claim that American Standard

interfered with his rights under 29 U.S.C. § 2612(a)(1)(D) of the Family and Medical Leave Act (FMLA) (the "interference" claim).[1] American Standard also disputes the district court's calculation of Thom's damages. Thom cross-appeals on the basis that the district court erred by not granting him the liquidated damages provided for in the FMLA (the "liquidated damages" claim), which calls for double damages except where the employer acted in "good faith" in discharging the employee.[2] We affirm on the interference claim and reverse on the liquidated damages claim.

---

[1] **§ 2612.  Leave requirement**
**(a) In general**
    **(1) Entitlement to leave**
[A]n eligible employee shall be entitled to a total of 12 workweeks of leave during any 12 month period for one or more of the following:
. . . .
        (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

[2] **§2617.  Enforcement**
**(a) Civil action by employees**
    **(1) Liability**
Any employer who violates section 2615 of this title shall be liable to any eligible employee affected —
        (A) for damages equal to —
        (i) the amount of —
            (1) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or
. . . .
        (ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and
        (iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith, and that the employer had reasonable grounds for believing that the act or omission which violated section 2615 of this title was in good faith, and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii) respectively.

## I. Facts

Thom worked for American Standard in Tiffin, Ohio, as a molder from July 16, 1969, until he was discharged on June 17, 2005 — a period of approximately 36 years. Because of a non-work- related shoulder injury that required surgery, Thom requested leave under the FMLA from April 27, 2005, until June 27, 2005. American Standard officially granted Thom's request for this time period in writing, the only company document setting out a return-to-work date. Dr. Brems performed surgery on Thom's shoulder on April 27. Thom's shoulder healed more quickly than anticipated. After a follow-up appointment, Dr. Brems wrote a note that cleared Thom for light duty work beginning on May 31 and set June 13 as the probable date on which Thom could return for unrestricted work. But when Thom attempted to resume light work on May 31, Amy Baker, in charge of Human Resources for American Standard, sent him home because she said that the company did not permit employees with non-work-related injuries to perform light duty work temporarily after FMLA leave.

On June 14, Amy Baker contacted Thom by phone because he failed to come to work on June 13. Thom responded that he was experiencing increased pain in his shoulder and would return to work on June 27, the end date of his approved leave. Although Thom promised to get a doctor's note extending his time table for recovery, he was unable to secure a timely appointment with Dr. Brems. He did schedule an appointment with his primary care physician, Dr. Vela, for the morning of June 17 and left a message with Baker notifying her of his progress. After the appointment, Thom went directly to work with a doctor's note requesting an extension of his leave until July 18. By the time he reached work, however, American Standard had already terminated his employment. American Standard had counted every day from June 13 to 17 as an unexcused absence; and, as a result, Thom had exceeded the absences allowed by the company. The district court granted partial summary judgment to Thom on the interference claim and reserved the question of damages for trial. The parties, however, waived their rights to a jury trial and submitted the question of damages to the judge. The district court awarded Thom $99,960 in attorney fees, $2,732.90 in costs, and

$104,354.85 in back pay. The court below further ordered that American Standard change Thom's termination date from June 17, 2005, to December 31, 2007, so that Thom would be eligible for his expected pension and retiree health benefits for both himself and his spouse. If this change was impossible, the court required American Standard to pay Thom a monthly annuity covering the difference between his expected pension and the pension that he actually received because of his early termination (a difference of 36%). The district court denied Thom statutory liquidated damages because it found that, despite violating the FMLA, American Standard acted both in "good faith" and with reasonable grounds for its actions when it discharged Thom.

## II. Standard of Review

The district court decided most of the issues now on appeal at summary judgment; this court reviews those decisions *de novo*. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). A district court should "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On the issue of damages, for which the district court acted as the fact finder, this court reviews any questions of fact for clear error. *Grand Traverse Band of Ottawa and Chippewa Indians v. Dir., Mich. Dep't of Natural Res.*, 141 F.3d 635, 638 (6th Cir. 1998). Finally, this court reviews the district court's decision to deny Thom statutory liquidated damages for "abuse of discretion . . . exercised consistently with the strong presumption under the [FMLA] statute in favor of doubling [the damages]." *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002) (internal quotations omitted).

## III. Thom's Interference Claim

American Standard asks this court to reverse the district court's partial grant of summary judgment in favor of Thom on his claim of FMLA interference and to either enter judgment in American Standard's favor or remand the claim for a jury trial. *See Thom v. Am. Standard*, 562 F. Supp. 2d 949, 955 (N.D. Ohio 2008). In support of his claim, Thom asserts that American Standard failed to adequately notify him of its

method for calculating FMLA leave because it did not inform him in writing or otherwise that company policy was to use a "rolling" method of leave calculation.

## A. Notice of American Standard's FMLA Calculation Method

The FMLA stipulates that, "an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period . . . because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(D). Employers, for their part, are "permitted to choose any one of . . . [four] methods for determining the '12-month period' in which the 12 weeks of leave entitlement . . . occurs." 29 C.F.R. § 825.200(b). Two of these four methods, namely, the "rolling" method and the "calendar" method, are pertinent to this case. The "rolling" method calculates an employee's leave year "backward from the date an employee uses any FMLA leave." *Id.* Using this method, Thom's leave would have expired on June 13. Appellant's First Br. 32. By contrast, under the "calendar" method, which renders an employee eligible for 12 weeks of FMLA leave each calendar year, Thom's allowed leave would have extended theoretically through July 14. American Standard terminated Thom for unexcused absences on June 17. Thus, Thom needs the "calendar" method to apply. At no time throughout the FMLA process did the Company mention to Thom that his leave time would be governed by a "rolling" 12-month period. The only written document he received from the company stated that his leave would expire on June 27. *He was only notified that American Standard had accelerated his return-to-work date on June 14, after it had already elapsed the day before. The first time Thom was given actual notice that the Company was using a "rolling" method requiring him to return to work on an earlier date was after he filed his lawsuit in this case when the defense lawyers raised the rolling method as a defense.*

American Standard now claims that it has always used the "rolling" method for calculating FMLA leave and that Thom should have known this fact. *Id.* at 38. It further contends that because two key officers in Thom's union provided affidavits during the lawsuit stating that American Standard historically maintained a policy of applying the "rolling" method, their knowledge is imputed to Thom "through simple agency law."

*Id.* In rejecting American Standard's constructive notice arguments, the district court concluded that an employer is required to take affirmative steps to inform employees of its selected method for calculating leave. *See Thom*, 562 F. Supp. 2d at 953 (citing *Bachelder v. Am. West Airlines, Inc.*, 259 F.3d 1112, 1117 (9th Cir. 2001); *Austin v. Fuel Sys., Inc.*, 379 F. Supp. 884, 894 (W.D. Mich. 2004)). We agree that employers should inform their employees in writing of which method they will use to calculate the FMLA leave year. This standard is consistent with the principles of fairness and general clarity, and applying it, American Standard's notice to Thom fell decidedly short. Although American Standard did internally amend its FMLA leave policy in March 2005 to indicate that it would now calculate employee leave according to the "rolling" method, it did not give Thom actual notice of this changed policy or in any way tell him that his official leave date would expire earlier than June 27, the date the company had approved. Consequently, Thom was entitled to rely on the calendar method and the date of June 27 that the company had given in writing. Neither Amy Baxter nor anyone else from her department or elsewhere advised him of any change. *See* 29 C.F.R. § 825.200(e).[3]

Despite the fact that the Company approved June 27 as Thom's date, American Standard relies heavily on *McMillan v. LTV Steel, Inc.*, 555 F.3d 218 (6th Cir. 2009), for the proposition that notice of an employer's method for calculating FMLA leave is sufficient when it is imputed from a union to its members. In *MacMillan*, this court held that a laid-off steelworker received adequate notice of a bankruptcy stipulation regarding his pension plan because "notice to [his union] constituted notice to [him]." *Id.* at 231. However, even conceding that imputed notice of an employer's calculation method may sometimes be adequate, it was not in this case. American Standard officially approved Thom's leave through June 27 — ten workdays in excess of his permitted leave under the "rolling" method. Certainly, actual notice of a particular return-to-work date trumps

---

[3]Even if American Standard's 2005 policy could be applied to his leave, Thom was nonetheless entitled to application of the "calendar" method. An employer that "subsequently select[s] an option" must "provide[] . . . 60-day notice to all employees of the option the employer intends to implement." *Id.* American Standard's 2005 policy became effective on March 1, 2005, triggering a 60-day notice window through April 29, 2005. *Thom*, 562 F. Supp. 2d at 955-56. Thom began his protected leave on April 27, 2005, two days before this notice period expired. *Id.* at 956. He was therefore entitled to "use the option providing the most beneficial outcome" to him. 29 C.F.R. § 825.200(e).

constructive notice of another. *See Butte v. Superior Copper Co. v. Clark-Mont. Realty Co.*, 249 U.S. 12, 27 (1919) (reasoning that "constructive notice . . . is the law's *substitute* for actual notice") (emphasis supplied). Thom testified that he was ready and would have returned to work by June 27. The district court rejected the Company's "constructive" notice argument and accepted June 27 as his return-to-work date. We agree that this conclusion is the only reasonable solution to the problem. The Company's post-lawsuit defenses that the rolling method should be used to fix the date or that any date earlier than June 27 should be used are unreasonable.

## B. Damages

American Standard's arguments that the district court should have denied Thom damages for the loss of his pension and for back pay are also unreasonable. Having discharged him unlawfully, the company caused him to lose his pension benefits and his pay until he could secure another job.

1. Pension Benefits. — The company bases its denial on the fact that it sold the plant where Thom worked on November 1, 2007, two years after firing Thom, at which time it "terminated all of its union employees." It argues that all pension benefits thereafter were "provided by the new employer," so that Thom "would have been terminated November 1, 2007" and would have had to collect his pension from his new employer. The district court rejected this causation claim out of hand because it obviously ignores the fact that it was the unlawful discharge that caused the loss of pension benefits to which Thom would have otherwise been entitled when they accrued in December 2007. The district court also said that the sale of the plant on November 1 was irrelevant to the causation issue.

2. Back Pay. — American Standard also argues that Thom did not mitigate his back pay damages because he spent five months after discharge obtaining a "GED," a General Education Degree, because his only job skills arose from his 36-year tenure as a molder with American Standard. When he received his GED, he received a job at approximately $10 an hour, $8 an hour less than his former job with American Standard. The Company argues against paying him wages for the period he worked for his GED

and for the difference between the pay of the job American Standard discharged him from and his new job. Again, we agree with the district court's rejection of this argument that apparently seeks to deny Thom any back pay after his unlawful discharge. The district court reasoned as follows:

> Plaintiff worked with and applied for jobs through the Ohio Department of Job and Family Services Veteran Administrator. However, given Plaintiff's limited skill set and the rural nature of his community, Plaintiff had limited job prospects. He found employment at Taiho in April 2006, working in a substantially equivalent position as he did with Defendant but receiving a significantly reduced salary. Thus, unlike the employees in the cases Defendant cites, Plaintiff did not voluntarily abandon his job search when he began work at Taiho, but rather took the best employment opportunity given the limitations of his skill set and location. Difficulty finding work is not the equivalent of stopping to look for work.
>
> In the alternative, Defendant asks this Court to cut off Plaintiff's back pay on November 1, 2007, which is when Defendant sold its operations, including its plant in Tiffin, Ohio, and terminated all its union employees . . . .
>
> Here again, however, Defendant's argument is not well taken because it fails to account for the fact that the new owners rehired all employees similarly situated to Plaintiff. In *Gaddy v. Abex Corp.*, 884 F.2d 312, 319 (7th Cir. 1989), the Seventh Circuit found that despite the plant's asset sale, plaintiff's back pay "need not be terminated as of the sale of the plant, since Gaddy could have continued her employment" with the plant's new owner. The court in *Gaddy* noted that "[a]lthough the sale of a plant often results in the restructuring and the effective elimination of former positions, here the evidence reveals that the remaining two employees in [plaintiff's] department continued their employment in the same positions with [the new owner] following the sale of the plant." *Id.*
>
> Likewise, employees similarly situated to Plaintiff were rehired after the November 1007 asset sale. Thus, the asset sale does not sever Plaintiff's back pay.

*Thom v. Am. Standard, Inc.*, 2009 WL 961182, at *3-4 (N.D. Ohio April 8, 2009). Thus, we agree with the district court that, like the discharge, American Standard's denial of his pension and back pay was unreasonable.

## IV.  Liquidated Damages

The district court found that American Standard acted unreasonably but met the test of good faith.  We do not agree because the company's after-the-fact reliance on the rolling method — its primary justification in the district court and on appeal — was a pretextual reason never raised in Thom's case before the discharge and only raised by American Standard once the case was in litigation.  The June 27 date agreed to in writing by American Standard is completely inconsistent with the rolling method and with counsel's present reliance on the rolling method as a justification for discharge.  Pretextual reasons for discharge manufactured after the fact in order to justify an earlier wrong are not consistent with good faith.  The rolling calendar pretext is an ostensible motive given after-the-fact as a cover for the real reason for firing this 36-year employee — whatever those economic motives may have been.  *See Wilkerson v. Auto Zone*, 152 F. App'x 444, 448, 2005 WL 2616016 (6th Cir. 2005) ("Auto Zone's stated reason for the [FMLA] discharge violation of the attendance policy was a pretext" justifying liquidated damages).  Pretextual excuses are equivalent to reasons "not held in good faith."  *See*, *e.g.*, *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 30 (2d Cir. 1997) ("the jury is certainly entitled to reject the standards [for terminating employees] claimed by the employer on the grounds that these standards were pretextual — *i.e.*, they were not held in good faith.").

To avoid paying liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii), the burden was on American Standard to prove both parts of the statutory exception.  *See Arban v. West Pub. Corp.*, 345 F.3d 390, 408 (6th Cir. 2003).  There is a strong presumption in favor of awarding liquidated damages that are double the amount of any compensatory damages.  Thus, "[a]lthough in the final analysis, we review a district court's decision on liquidated damages for abuse of discretion, that discretion must be exercised consistently *with the strong presumption* under the statute in favor of doubling."  *Elwell*, 276 F.3d at 840 (emphasis added).

American Standard claimed in the district court and now on appeal that it terminated Thom in good faith because it thought that he had exhausted his FMLA leave

under its long-used "rolling" method of calculation. We have already pointed out the flaws in this argument. The "rolling" method was not even formally adopted into the company's published policies until March 2005. American Standard's consistent, long-term use of the "rolling" method is also belied by its approval of Thom's request for leave until June 27 — a date inconsistent with this method of calculation. And even if the "rolling" method had been a fully implemented company policy throughout 2005, American Standard could not have reasonably relied on it in Thom's case since, when it approved his leave request, it departed from this policy. American Standard cannot demonstrate good faith by pointing to its reliance on a policy that Thom did not know about and was not used in Thom's case. American Standard articulated this justification only when counsel for the company asserted it as a defense after the lawsuit was in progress.

To establish good faith under the FMLA, a defendant must show that "it honestly intended to ascertain the dictates of the FMLA and to act in conformance with it." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 868 (8th Cir. 2006). American Standard makes no such showing. On June 14, 2005, Thom informed American Standard that he still felt his return date was June 27 — the date his employer initially approved. Confusion existed even among American Standard's own employees about when Thom was scheduled to return. In early June — well after Dr. Brems' updated note supposedly informed American Standard of the June 13 return date — Baker informed another Human Resources employee that she still considered June 27 to be the relevant date. R. 32 Baker Dep. 125. Despite this understanding, American Standard continued to invoke the calculation method most prejudicial to Thom. It did so even after Thom informed Baker that he was actively working to resolve the return-to-work question by obtaining a doctor's note. When Dr. Brems learned that Thom had been discharged, he wrote a letter to American Standard explaining that any confusion as to Thom's leave was not Thom's fault and asking that Thom's job be restored. The record contains no response from American Standard and no effort to investigate further or correct its error. The letter is as follows:

August 22, 2005

Mr. Carl J. Thom
1000 E Township Rd. 122
Tiffin, OH  44883

Mr. Carl J. Thom
CC # 23167166

To Whom It May Concern:

. . . .

It was only through circumstances of my absence, that can be well documented, that the situation unfortunately arose.  I would add that Mr. Thom has been a model patient of mine, with very significant work ethic, working diligently on his stretching exercises.  I have no doubt that having worked for better than 30 years with your company, that the same demonstration of his work ethic would likely be present.  It would therefore again seem shameful that he could lose his job over a scheduling issue that had its bases in my office and not with Mr. Thom himself.

Mr. Thom's intraoperative surgical findings clearly documented a near complete rupture of his biceps tendon and significant inflammation and partial tearing of his rotator cuff mechanism.  Although I did see him early in June of 2005, at which time he reported good progress, it was my thought at that time for him to return to work on a given date.  Unfortunately, his recovery then slowed and he had further concerns about possibly a re-tearing or re-injuring his rotator cuff.  It was only with that framework that he was concerned about returning to work and did not do so because he could not get a hold of me for my authorization.

I would certainly hope that in an effort to provide the best care possible, that you give deep consideration to re-hiring Mr. Thom as a loyal and hardworking employee that I am sure he is.  At this point in time Mr. Thom can return to work, certainly although he will have some pain as he tries to improve his range of motion and also works through the inflammatory process, I think he can safely return to work without further injury to himself or risk to you or your corporation.

. . . .

Sincerely,

/s/

John Brems, M.D.

JB/dm
D:  08/22/2005
T:  08/24/2005

R. 32 Baker Dep. Ex. 122.  In this case, after-the-fact reliance on the "rolling" method of calculation should not grant American Standard immunity from liquidated damages, and the company's obdurate refusal to correct an obvious mistake that constituted a wrongful discharge of this 36-year employee reinforces the case for liquidated damages.

Accordingly, this Court affirms the judgment of the district court on the interference claim under 29 U.S.C. § 2612 including damages and reverses the judgment of the district court on the liquidated damages claim under 29 U.S.C. § 2617(a) and remands for the doubling of damages in accordance with this opinion.