*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0024p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STEELWORKERS OF AMERICA, AFL-CIO,
CLC, et al.,

*Plaintiffs-Appellees,*

No. 05-4641

*v.*

COOPER TIRE & RUBBER COMPANY, et al.,
*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Ohio.
No. 04-07411—David D. Dowd, Jr., District Judge.

Argued: October 31, 2006

Decided and Filed: January 17, 2007

Before: SILER, GILMAN, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael T. McMenamin, WALTER & HAVERFIELD, Cleveland, Ohio, for Appellants. David M. Fusco, SCHWARZWALD & McNAIR, Cleveland, Ohio, for Appellees. **ON BRIEF:** Michael T. McMenamin, Nancy A. Noall, Morris L. Hawk, WALTER & HAVERFIELD, Cleveland, Ohio, for Appellants. David M. Fusco, James G. Porcaro, Melanie R. Bordelois, SCHWARZWALD & McNAIR, Cleveland, Ohio, for Appellees.

_____

## OPINION

_____

SILER, Circuit Judge. Cooper Tire & Rubber Company ("Cooper") and United Steelworkers of America Local 207L ("Local 207L" or the "Union") were parties to a collective bargaining agreement ("CBA") containing an arbitration clause. The parties simultaneously executed a side letter that limited company contributions to retiree healthcare benefits. Following a dispute involving one of the side letter's terms, Local 207L filed suit in federal district court on behalf of the retirees, seeking to compel arbitration of the grievance. Local 207L claimed that the disagreement was arbitrable under the scope of the CBA's arbitration clause even though the side letter did not contain a separate provision for arbitration. The district court agreed, granting the Union's motion for summary judgment on the issue of arbitrability. For the reasons that follow, we **AFFIRM** the district court's decision to compel arbitration of the dispute over the side agreement.

1

However, we **VACATE** the district court's order certifying the class under FED. R. CIV. P. 23(b) and **REMAND** for further proceedings consistent with this opinion.

## I.

Cooper, a manufacturer of rubber and tires, has a plant in Findlay, Ohio (the "Plant"). Local 207L and the United Steelworkers of America[1] have been parties to a series of CBAs with Cooper since 1941. Together, the USW and Local 207L represent the Plant's bargaining unit employees.[2]

The Union and Cooper were parties to a CBA, originally effective from November 6, 2000, to October 31, 2003, and extended to February 16, 2004, that governed the terms and conditions of the Plant's bargaining unit employees (the "2000 Basic Agreement"). Article II of the 2000 Basic Agreement pertains to the grievance procedure, which culminates in arbitration. The relevant language of Article II provides:

> A grievance is a complaint, dispute, or controversy between the Company and the Union, in which it is claimed that the Company has failed to comply with an obligation assumed by it under the terms of this Agreement, and which involves either 1) a dispute as to the facts involved, [or] 2) a question concerning the meaning, interpretation, scope, or application of this Agreement . . . .  Any grievance or dispute which remains unsettled after following the Grievance Procedure outlined above may be appealed to arbitration by the party desiring arbitration. . . . The decision of the . . . [a]rbitrator shall be final and binding to both parties.

The Union and Cooper were also parties to an Employee Pension and Insurance Agreement, originally effective from November 6, 2000, to October 31, 2003, which also was extended until February 16, 2004 (the "2000 Benefits Agreement"). Article 14 of the 2000 Benefits Agreement contains an appeals provision that provides:

> If any dispute . . . shall arise . . . between the Company and any Employee, Pensioner, or former Employee who has retired during the life of the Agreement . . . or between the Local Union and Company as to the interpretation or application of this Agreement, such dispute shall . . . be taken up as a grievance beginning with the next step preceding arbitration, and be thereafter handled in accordance with the Grievance Procedure provided in the Basic Labor Agreement.

Article 11 of the 2000 Benefits Agreement covered healthcare benefits for employees and their dependents. Section 11.5 dealt specifically with medical benefits of retired employees and their spouses and dependents. However, neither the 2000 Basic Agreement nor the 2000 Benefits Agreement mentioned the cap on Cooper's contributions toward retiree healthcare that is outlined in the side letter.[3]

---

[1]United Rubber Workers of America was the predecessor to the United Steelworkers of America at the Plant prior to their 1995 merger.  In April 2005, the United Steelworkers of America, AFL-CIO, CLC merged with the Paper, Allied-Industrial, Chemical and Energy Workers International Union to form the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW").

[2]The USW and Local 207L are sometimes hereinafter collectively referred to as the "Union."

[3]Courts often use the terms "side letter," "side agreement," "side settlement," and "settlement agreement" interchangeably.  For purposes of this opinion, we use "side letter" and "side agreement" to connote an agreement separate from the underlying CBA.  However, where the agreement settles a dispute arising under the underlying CBA,

As is common in labor agreements, each CBA and all related agreements between Cooper and the Union were included in a collective bargaining "packet." Any side agreements between Cooper and the Union were also included. Since 1991, every packet has contained a side letter that caps Cooper's annual contributions toward retiree healthcare benefits (the "FASB Letters" or "Side Letters").[4] The FASB Letters were drafted in response to the Financial Accounting Standards Board's implementation of FAS-106, in 1991.[5] Cooper's implementation of the FASB Letters was consistent with accounting practices throughout the rubber industry. Cooper and the Union disagree about whether the FASB Letters were "negotiated" or were the unilateral decision by Cooper. According to the Union, the fact that there was a signature line for the Union president which stated "Agreed" illustrates that the FASB Letters were a negotiated agreement. Cooper contends that its decision to implement the FASB Letters was unilateral and would have been carried out with or without the Union's consent.

The 2000 FASB Letter provides:

The Company shall provide benefits under the Basic Medical Benefits Program, and the Major Medical Benefits Program as set forth in the Pension and Insurance Agreement dated November 6, 2000 for retirees and their dependents subject to the following limitations:

1.    The average annual Company contributions to be paid for all health care benefits per retired employee (including their surviving spouse) who retires on or after November 24, 1991, October 17, 1994, November 12, 1997, and November 6, 2000 shall not exceed $9,800 for retirees (including surviving spouses) under age 65 and $3,850 for retirees (including surviving spouses) over age 65. The age of any such retiree or surviving spouse will be determined as of each January 1 for the entire year.

2.    If the average annual cost of health care benefits for each such group described in Paragraph 1 above exceeds the specified amount, the cost in excess of that amount shall be allocated evenly to all retired employees (including surviving spouses) in such group.

3.    Notwithstanding the foregoing, no retired employee or surviving spouse shall be obligated to contribute for such excess health care cost until January 1, 2004.

4.    The average annual cost of health care benefits for each group shall be determined by taking the total annual health care payments made by the Company for each group separately and dividing each amount by the number of retired employees (including surviving spouses) in such group as of January 1 of each year.

---

we use the terms "settlement agreement" or "side settlement."

[4]The first FASB Letter was dated November 24, 1991. Subsequent FASB Letters were dated October 17, 1994; November 12, 1997; and November 6, 2000. Except for the dates and the monetary threshold triggering the caps, the substance of the Side Letters has not changed.

[5]FAS-106 was an accounting rule requiring companies to report all post-retirement benefit obligations other than pensions on their balance sheets instead of on a pay-as-you-go basis. By setting a cap on retiree healthcare liabilities, companies safeguarded against having to report astronomical amounts in liabilities.

5.    The parties agree that the amount of the maximum average annual Company contributions for health care benefits as described in Paragraph 1 above shall be considered a mandatory subject of Collective Bargaining in any subsequent negotiations. It is further agreed by the parties that this issue shall not be influenced by or bound to any previous or future Board or Court decisions.

Notably, the FASB Letters do not contain any language relating to arbitration or other grievance procedures should a dispute develop. Since 1991, the FASB Letters have been discussed and executed at the same time as the Basic and Benefits Agreements. The only factor distinguishing the execution of the Basic and Benefits Agreements from the FASB Letters was their dates of expiration. For example, while the 2000 Basic and Benefits Agreements were adopted on November 6, 2000, the same date as the 2000 FASB Letter, they expired on October 31, 2003, whereas the FASB Letter would not take effect until January 1, 2004.

While the Union had requested that the FASB Letters and all side letters be included in the employee contract booklet, Cooper declined, citing that the volume of such a booklet would be impracticable. Cooper admits that whether a side letter is included in the contract booklet is a very minor factor in determining if the content of a side letter is arbitrable.

Effective January 1, 2004, Cooper implemented the 2000 FASB Letter in accordance with its interpretation of the term "per retired employee."[6] On January 5, 2004, the Union filed a grievance with Cooper. Cooper responded that the 2000 FASB Letter was not subject to grievance or arbitration procedures because: 1) it does not involve an obligation imposed by the 2000 Basic Agreement as to the facts involved, or raising a question concerning the "meaning, interpretation, scope, or application" of the 2000 Basic Agreement; 2) it does not involve a dispute concerning the interpretation or application of the 2000 Benefits Agreement; and 3) the Union has no standing to pursue the grievance as it involves claims by non-Union members.

In July 2004, the Union sued Cooper in federal district court to compel arbitration, alleging the following causes of action: 1) claim to compel arbitration under Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, by labor unions and retirees, on behalf of themselves and as class representatives, over the contributions that the retirees are required to pay for medical coverage; or, in the alternative; 2) breach of contract under Section 301 of the LMRA; and also, in the alternative; 3) violation of Section 502(a)(1)(B) and (3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) and (3). In December 2004, the parties agreed to an order certifying the class under FED. R. CIV. P. 23(b)(2). Class A (the "Retirees") consisted of all individuals meeting the following criteria:

(a)    is a former hourly employee of Cooper Tire who worked at the Plant;

(b)    retired from Cooper Tire on or after November 24, 1991;

(c)    was represented by the USWA, or its predecessors, for purposes of collective bargaining prior to retirement;

(d)    was a retired participant of the Plan at any time subsequent to January 1, 2004; and

---

[6]Cooper interprets "per retired employee" as applying to the employee's entire household, while the Union asserts that it applies on an individual basis.

(e)     has been required to pay contributions toward the cost of coverage under the Plan (either for him or herself or for him or herself and eligible dependents) at any time subsequent to January 1, 2004.

Class B (the "Survivors") consisted of those individuals qualifying as the following:

(a)     is a surviving spouse of an individual who:

      (i)      was a former hourly employee of Cooper Tire who worked at the Plant;

      (ii)     retired from Cooper Tire on or after November 24, 1991; and

      (iii)    was represented by the USWA, or its predecessors, for purposes of collective bargaining prior to retirement;

(b)     was a beneficiary of the Plan at any time subsequent to January 1, 2004; and

(c)     has been required to pay contributions toward the cost of coverage under the Plan (either for him or herself alone or for him or herself and eligible dependents) at any time subsequent to January 1, 2004.

This class also includes eligible dependents of all individuals who meet the criteria above.[7]

The Stipulation and Agreed Order Concerning Class Certification bound "all members of Class A or B" to "any . . . arbitration award resolving the 'Grievance,'" without providing the class members an opportunity to opt out of representation by the Union.

Cooper moved for summary judgment on grounds that: 1) it never agreed to submit disputes over the FASB Letter to arbitration; 2) the FASB Letter is collateral to the Basic and Benefits Agreements and, therefore, is not arbitrable under either of those agreements' arbitration clauses; 3) the Union does not have standing to arbitrate a dispute on behalf of the Retirees or the Survivors; and 4) the Union has no authority to waive the Retirees' or Survivors' rights to litigate their ERISA claims. The district court denied Cooper's motion for summary judgment and granted the Union's motion for summary judgment on the issue of arbitrability. It held that the presumption of arbitrability had not been overcome with respect to the 2000 Side Letter. The district court also held that even though the Union no longer serves as the exclusive bargaining representative of a retired employee, it still has standing to pursue the rights of the Retirees and Survivors as a party to the CBAs.

On appeal, Cooper argues that the district court erred: 1) in finding that the dispute over the Side Letter was arbitrable; 2) in finding that the Union has standing to arbitrate claims on behalf of the Retirees and Survivors, who are no longer or who have never been represented by the Union; and 3) in waiving the class members' rights to a federal court forum by ordering arbitration of their claims against Cooper, with no opportunity to opt out of class representation by the Union.

---

[7] The Retirees and the Survivors are sometimes collectively referred to as the "class members."

## II.

### A. Standard of Review

We review the district court's decision denying Cooper's motion for summary judgment de novo. *See McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004). Similarly, we review de novo the district court's decision to compel arbitration of a particular dispute. *See Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 311 (6th Cir. 2000) (citations omitted). Whether a claimant has standing is a question of law that we review de novo. *See United States v. Miami Univ.*, 294 F.3d 797, 806 (6th Cir. 2002) (citation omitted). Finally, we review a district court's grant of class certification for an abuse of discretion. *See Coleman v. General Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002).

### B. Arbitrability of the 2000 FASB Letter

In deciding the arbitrability of a dispute, we begin with the presumption that national labor policy favors arbitration. *See Gen. Drivers, Salesmen & Warehousemen's Local Union No. 984 v. Malone & Hyde, Inc.*, 23 F.3d 1039, 1043 (6th Cir. 1994) (citing *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). Our analysis is guided by four principles set forth in *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643 (1986), and summarized by this circuit as follows:

> 1) a party cannot be forced to arbitrate any dispute that it has not obligated itself by contract to submit to arbitration; 2) unless the parties clearly and unmistakably provide otherwise, whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is a question for judicial determination; 3) in making this determination, a court is not to consider the merits of the underlying claim; and 4) where the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.[8]

*Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 485 (6th Cir. 2006) (citing *United Steelworkers v. Mead Corp..* 21 F.3d 128, 131 (6th Cir. 1994)). "The presumption favoring arbitration is based on a policy recognizing arbitration as a 'substitute for industrial strife,' *see Malone & Hyde,* 23 F.3d at 1043 (quoting *Warrior & Gulf*, 363 U.S. at 578)), and on the belief that arbitrators, more so than the

---

[8]Cooper contends that because the fourth principle – presuming arbitrability – only applies where the agreement contains an arbitration clause, it is not applicable to side agreements that, as here, do not contain a separate arbitration clause. Cooper's argument is flawed for several reasons. Namely, it does not cite to any case that supports this novel proposition. Moreover, the presumption favoring arbitrability is a principle that courts are to apply in making the determination of "whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance." *See Cummins*, 434 F.3d at 485. The dispute between Cooper and the Union involves whether the Basic or Benefits Agreement creates a duty for the parties to arbitrate their dispute over the FASB Letter. This is exactly the type of dispute where the presumption favoring arbitrability is to be applied; the fact that the grievance is over a side letter is of little consequence. This conclusion is supported by our policy reasons for favoring arbitration, which are just as prominently raised by a grievance over a side letter. *See Malone & Hyde*, 23 F.3d at 1043 (citations omitted); *see also Warrior & Gulf*, 363 U.S. at 578-79 ("[The Collective Bargaining Agreement] is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. [It] covers the whole employment relationship.") (citation and footnote omitted); *Inlandboatmens Union v. Dutra Group*, 279 F.3d 1075, 1079 (9th Cir. 2002) ("[A] collective bargaining agreement is not limited solely to the specific provisions of the basic labor contract formally executed by the parties, but it may also include, among other things, written side agreements.") .

courts, possess the proper experience and expertise to resolve labor disputes," *id*. (citing *Litton Fin. Printing Div'n v. NLRB*, 501 U.S. 190, 213-14 (1991) (Marshall, J., dissenting)).

The question presented here, whether a dispute over a side agreement that does not provide for arbitration falls within the CBA's arbitration clause, is one that this court has not previously addressed. There is a split among the circuits that have spoken on this issue. The Second, Fourth, and Eighth Circuits apply the "collateral" test in determining whether a dispute over a side agreement is arbitrable. Under the collateral test, courts consider the similarity of the side agreement's subject matter to the subject matter of the CBA. If the subject matter is dissimilar, the side agreement is deemed collateral to the CBA. However, where the side agreement is "integral" to the CBA, courts permit arbitration of disputes over its provisions. *See, e.g.*, *Cornell Univ. v. UAW Local 2300*, 942 F.2d 138, 140 (2d Cir. 1991) (holding that a "letter of understanding" was "collateral" to the CBA and therefore not governed by the CBA's arbitration clause); *Adkins v. Times-World Corp.*, 771 F.2d 829, 830-31 (4th Cir. 1985) (holding that an "addendum" to the CBA was integral to it and therefore subject to the arbitration clause); *United Steelworkers v. The Duluth Clinic, Ltd.*, 413 F.3d 786, 788 (8th Cir. 2005) ("This court . . . follows the Second Circuit's approach.").

Three other circuits, the Third, Seventh, and Ninth, have adopted the "scope" test. They hold that unless the parties indicate otherwise, disputes over a side agreement are arbitrable if the subject matter of the side agreement is within the scope of the CBA's arbitration clause. *See*, e.g., *L. O. Koven & Bro., Inc. v. Local Union No. 5767, United Steelworkers*, 381 F.2d 196, 204-05 (3d Cir. 1967) (concluding that a dispute over a side agreement that was silent as to arbitrability was governed by the CBA's arbitration clause because the underlying subject was one "ordinarily a matter for consideration by an arbitrator" under the CBA); *Niro v. Fearn Int'l, Inc.*, 827 F.2d 173, 175 (7th Cir.1987) (holding that a "settlement agreement is an arbitrable subject when the underlying dispute is arbitrable"); *Dutra Group*, 279 F.3d at 1080 (holding that "disputes arising under a side agreement must be arbitrated if the dispute relates to a subject that is within the scope of the CBA's arbitration clause").

We agree with the scope test as applied by the Ninth Circuit.[9] In determining the arbitrability of side letters and side agreements, we begin our inquiry by analyzing the CBA's arbitration clause. *See Dutra Group*, 279 F.3d at 1080. With the scope of the arbitration clause in mind, we then look to the subject matter of the side agreement to determine if it falls within the clause's intended coverage. *Id*. Of course, parties may exclude disputes arising under a side agreement from arbitration should they include a statement to that effect in the arbitration clause of the CBA or in the side agreement itself. *Id.* at 1080 n.6 (citation omitted).

Turning to the arbitration clause in the 2000 Benefits Agreement, it provides for arbitration of "any dispute . . . as to the interpretation or application of this Agreement." Recently, we noted that "the presumption of arbitrability is particularly applicable where the arbitration clause provides for arbitration of any controversy involving the interpretation of the CBA." *Cleveland Elec. Illuminating Co. v. Util. Workers, Local 270*, 440 F.3d 809, 814 (6th Cir. 2006) (citing *Commc'ns*

---

[9]We do not agree with the Union's assertion that this circuit has already adopted the scope test as evidenced by our decisions in *Utility Workers Union, Local 118 v. Oh. Edison Co.*, No. 97-4332, 1998 WL 869941 (6th Cir. Dec. 3, 1998); *Malone & Hyde*, 23 F.3d at 1043; and *Amalgamated Clothing Workers v. Ironall Factories Co.*, 386 F.2d 586 (6th Cir. 1967). While these cases involved disputes over settlement agreements that we determined were arbitrable under the CBA's arbitration clause, each of the settlement agreements resolved grievances that were already arbitrable under the underlying CBA. Here, the FASB Letter is a side letter, not a settlement agreement resolving an underlying dispute that was arbitrable in the first place under the CBA . Therefore, this case presents a question of first impression for our court.

*Workers v. Mich. Bell Tel. Co.*, 820 F.2d 189, 193 (6th Cir. 1987)); *see also Simon v. Pfizer, Inc.*, 398 F.3d 765, 775 (6th Cir. 2005) (interpreting "any dispute arising out of an agreement" broadly) (emphasis omitted). Construing the scope of the 2000 Benefits Agreement's arbitration clause broadly, we next turn to the subject matter of the side agreement. Here, the 2000 FASB Letter concerns retirement healthcare contribution caps. While the narrow subject of retirement healthcare contribution caps is not discussed in the 2000 Benefits agreement, references to medical benefits generally, and healthcare coverage of retired employees, are replete. For example, Article 11 of the 2000 Benefits Agreement is entitled "Hospital, Surgical, Drug, and Medical Benefits for Employees and Their Dependents." Sections 11.2 - 11.8 of Article 11 outline healthcare liabilities under the 2000 Benefits Agreement. Section 11.15 addresses healthcare coverage of retired employees. The subject matter of the 2000 FASB Letter – retirement healthcare contribution caps – certainly can be said to pertain to a subject addressed in the 2000 Benefits Agreement – namely, retiree healthcare benefits. Given this court's broad reading of the 2000 Benefits Agreement's arbitration clause, *see Cleveland Elec.*, 440 F.3d at 814, the 2000 FASB Letter clearly falls within its scope. Moreover, the CBA's arbitration clause does not contain any exclusion for disputes arising under side agreements. Neither does the 2000 FASB Letter exclude disputes over its terms from arbitration. Thus, the side agreement at issue involves a grievance that, under the provisions of the 2000 Benefits Agreement, may be arbitrated.

Cooper contends that the implementation dates of the FASB Letters conclusively demonstrate that they were never intended to fall within the scope of the Benefits Agreements. All of the Benefits Agreements, and their corresponding arbitration clauses, had a duration of three years. However, each of the corresponding FASB Letters was not to be implemented until after the Benefits Agreement had expired. According to Cooper, this discrepancy in dates indicates that the FASB Letters are not within the scope of the Benefits Agreements' arbitration provisions because no dispute could have developed before the corresponding Benefits Agreement expired. We rejected a similar argument in *Malone & Hyde*. There, we noted that the "Supreme Court has recognized that a party's obligation to arbitrate does not automatically cease upon termination of the collective bargaining agreement." *Malone & Hyde*, 23 F.3d at 1045 (citing *Nolde Bros., Inc. v. Bakery & Confectionery Workers Union, Local No. 358*, 430 U.S. 243, 252 (1977)). Therefore, the fact that the Benefits Agreements expired before the FASB Letters were to be implemented does not necessarily preclude arbitration of a dispute over the Letters.

In adopting the scope test, we note that it is consistent with the important goal of establishing industrial peace because this test establishes greater certainty in the bargaining process. *See Dutra Group,* 279 F.3d at 1081 (citing *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 785 (1996) ("The object of the National Labor Relations Act is industrial peace and stability, fostered by collective-bargaining agreements providing for the orderly resolution of labor disputes between workers and employees.")). The collateral test, in our opinion, creates uncertainty because parties have no gauge as to when a side agreement is similar or dissimilar to the underlying CBA. *See id.* With the scope test, the inquiry focuses on the breadth of the arbitration clause, thereby permitting parties to reference the plethora of case law interpreting arbitration clauses of other CBAs. Simply put, "the general arbitration clause will apply to a dispute over a side agreement to the same extent it would govern any other disagreement between the parties." *Id.*

Should a party intend not to arbitrate disputes over a particular side agreement, language to that effect may be included within the side agreement. Moreover, if the parties wish to restrict the CBA's arbitration clause from applying to side agreements, they can provide for such within the language of the CBA. This test is consistent with our presumption favoring arbitration, *see Warrior & Gulf*, 363 U.S. at 582, and is also congruous with reading the CBA as "more than a contract," and as an instrument covering the "whole employment relationship." *Id.* at 578-79.

We are also satisfied that the outcome of applying the scope test to this case supports the policy concerns behind the presumption favoring arbitration of labor disputes. First, submitting the dispute over the 2000 FASB Letter to arbitration provides a forum in which the outcome is not only determined by the language of the contract, but is also guided by such factors as "the effect upon productivity of a particular result, its consequence to the morale of the shop, [and the arbitrator's] judgment whether tensions will be heightened or diminished." *See Warrior & Gulf*, 363 U.S. at 582. An arbitrator, unlike a judge, is "usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract." *Id.* "The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed." *Id.*

Moreover, contrary to Cooper's contention, arbitration of the instant dispute does promote "the peaceful resolution of labor disputes." *See Commc'ns Workers,* 475 U.S. at 650 (quoting *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 371-72 (1984)). Cooper argues that because the class members are all retirees, their spouses, and dependents, they, unlike current employees, have no recourse to economic weapons, i.e., strikes. Cooper cites *Robbins* as support for its contention. *Robbins* involved a dispute between the trustees of an employee trust fund and the employers. *See Robbins*, 466 U.S. at 369. The employers sought an order to bind the trustees to the CBA's arbitration clause. *See id.* at 366. The Supreme Court held that "[b]ecause the trustees of employee-benefit funds have no recourse to [strikes and lockouts], requiring them to arbitrate disputes with the employer would promote labor peace only indirectly, if at all," and, therefore, the presumption of arbitrability did not apply. *Id.* at 372.

*Robbins* is distinguishable for reasons that we have previously addressed. Namely, the dispute over the 2000 FASB Letter is between the Union and Cooper, whereas the grievance in *Robbins* was brought by trustees, not by the union. In *Cleveland Electric*, this distinction was critical to our finding that "the presumption of arbitrability applies to disputes over retirees' benefits if the parties have contracted for such benefits." *See Cleveland Elec.*, 440 F.3d at 816; *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Yard-Man, Inc.*, 716 F.2d 1476, 1486 (6th Cir. 1983) (noting that the union, as a signatory to the contract, could bring an action for third party beneficiary retirees because it has a direct interest in maintaining the integrity of the retiree benefits created by the CBA). Because it is the Union, not a third party beneficiary, that brought the grievance over the 2000 FASB Letter, there is recourse to economic weapons such as striking. Moreover, even though the class consists of all non-Union member Retirees and Survivors, the Union still has an interest in resorting to economic weapons in order to maintain the integrity of the bargaining process. Additionally, the dispute over the 2000 FASB Letter may also affect how[10] retirement contribution caps will be applied to current employees, who are Union members. Therefore, it is clear that our holding furthers the policy "recognizing arbitration as a 'substitute for industrial strife.'" *See Malone & Hyde*, 23 F.3d at 1943 (quoting *Warrior & Gulf*, 363 U.S. at 578)).

### C. Union's Standing

Cooper also maintains that the district court erred in finding that the Union has standing to represent the Retirees and Survivors. We recently addressed this question in *Cleveland Electric,*

---

**[10]**Cooper also asserts that the presumption favoring arbitration is not applicable to the FASB Letters because retiree health benefits are a permissive, not a mandatory, subject of bargaining. This argument was also addressed in *Cleveland Electric*, where we held that the "presumption of arbitrability applied to a dispute over retirees' benefits brought by the union because the union and employer were parties to the contract providing for arbitration," notwithstanding the fact that retirees' benefits are not a mandatory subject of bargaining. *See Cleveland Elec.*, 440 F.3d at 815 (citing *Mich. Bell*, 820 F.2d at 192).

stating that "where a union and company bargain for retiree benefits and include the benefits in a contract, the union has standing to represent the retirees in any dispute concerning those benefits." *Cleveland Elec.*, 440 F.3d at 815. Moreover, we noted that "a union's assertion of rights outside the bargaining unit [is] not dispositive of the duty to arbitrate." *Id.* (citing *Mich. Bell*, 820 F.2d at 192); *see also Yard-Man*, 716 F.2d at 1486 (describing how the union, as a signatory to the contract, could bring an action for third party beneficiary retirees because it has a direct interest in maintaining the integrity of the retiree benefits created by the CBA). Therefore, it is clear that the Union does have standing to arbitrate on behalf of the Retirees, and given *Cleveland Electric's* reasoning, it also has standing to arbitrate the claims of the Survivors.

### D. Consent of the Retirees and Survivors to Union Representation

As a final matter, Cooper argues that even if the dispute over the FASB Letter is subject to arbitration and the Union has standing, the district court erred by not requiring consent of the class members to Union representation. The Notice of Class Certification stated that "any final arbitration award, whether for or against the Defendants, [would] apply to" the Retirees and the Survivors. In ordering the class certification as such under Rule 23(b)(2), the district court precluded the class members' ability to pursue their ERISA rights, as well as any other claims, directly with Cooper.

In *Cleveland Electric*, we recognized two dangers in failing to require a union to obtain retirees' consent before arbitrating on their behalf. *See Cleveland Elec.*, 440 F.3d at 817. First, employers could be faced with numerous retirees' claims and lawsuits if a determination is made that the Union was not authorized to act on the retirees' behalf. *See id.* (citing *Meza v. General Battery Corp.*, 908 F.2d 1262, 1280 (5th Cir. 1990) (holding that an injured former employee's lawsuit was not barred by res judicata where he never authorized the union to represent his interest in a previous lawsuit over the same benefits)) . Second, retirees could lose their rights to pursue their claims directly with the employer if the union obtains an unfavorable arbitration decision. *See id.* (citing *Rossetto v. Pabst Brewing Co.*, 128 F.3d 538, 540 (7th Cir. 1997) (stating that if the union "loses in arbitration, the retirees lose, period")); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Acme Precision Prods., Inc.*, 515 F. Supp. 537, 540 (E.D. Mich. 1981) (holding that where a union sues on behalf of retirees, the judgment in that suit acts as a bar to suits by individual retirees brought at a later time).

We agree with the Union that there is no real danger that Cooper would have to relitigate the same issues with individual retirees that will have already been arbitrated with the Union. The Notice of Class Certification makes clear that all class members will be bound by any final arbitration award. Moreover, Cooper agreed to the order certifying the class under Rule 23(b). Therefore, our concern here is not for Cooper, but rather that the Retirees and Survivors will be bound by an unfavorable arbitration decision to which they never consented. As the Seventh Circuit stated in *Rossetto*, "[a] union's power to negotiate with management derives from the fact that the union is the exclusive bargaining representative of a group of people." *Rossetto*, 128 F.3d at 539. Because the Union is not the exclusive bargaining representative of the Retirees and Survivors, *see Allied Chemical & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 172 (1971) (holding retirees are not "employees" within the bargaining unit), any claims, statutory or otherwise, belong to the Retirees and Survivors, individually. The Union may still arbitrate on behalf of the Retirees and Survivors, but only after they have consented to such representation. *See Cleveland Elec.*, 440 F.3d at 818 (requiring consent of retirees before allowing union to arbitrate on their behalf). Neither the Union nor a court may preclude the Retirees or Survivors the right to litigate with Cooper individually.

### III.

For the foregoing reasons, the judgment of district court compelling arbitration of the dispute over the side letter is **AFFIRMED**, the Stipulation and Agreed Order Concerning Class Certification is **VACATED,** and the case is **REMANDED** for further proceedings consistent with this opinion.