RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

TEAMSTERS LOCAL UNION NO. 89,
                    *Plaintiff-Appellee,*

            *v.*                                    No. 09-5534

THE KROGER CO.,
                    *Defendant-Appellant,*

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
                    *Counterclaim Defendant.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 07-00351—Thomas B. Russell, Chief District Judge.

Argued: August 3, 2010

Decided and Filed: August 25, 2010

Before: COLE and McKEAGUE, Circuit Judges; MAYS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Timothy P. Reilly, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellant. Frederick Perillo, PREVIANT, GOLDBERG, UELMAN, GRATZ, MILLER & BRUEGGEMAN, Milwaukee, Wisconsin, for Appellee. **ON BRIEF:** Timothy P. Reilly, John B. Nalbandian, Daniel J. Hoying, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellant. Frederick Perillo, Nathan D. Eisenberg, PREVIANT, GOLDBERG, UELMAN, GRATZ, MILLER & BRUEGGEMAN, Milwaukee, Wisconsin, for Appellee.

---

[*] The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of Tennessee, sitting by designation.

1

_____

**OPINION**

_____

COLE, Circuit Judge. Plaintiff-Appellee Teamsters Local Union No. 89 ("Local 89" or "the Union") represents employees in a Kentucky warehouse operated by Defendant-Appellant The Kroger Co. ("Kroger"). The parties negotiated a collective bargaining agreement governing labor relations at that warehouse. Local 89 filed two grievances alleging that Kroger violated this agreement by subcontracting out operations to third parties employing non-Local 89 members. Kroger refused to arbitrate these grievances, and Local 89 filed suit to compel arbitration. The district court granted Local 89 summary judgment on its claim to compel arbitration. Kroger appeals that decision. We **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

**A. The Parties and the Master Agreement**

Local 89 is a local affiliate of the Counterclaim Defendant International Brotherhood of Teamsters ("IBT") and represents warehouse and transportation employees at Kroger's warehouse facility in Louisville, Kentucky, known as the Kentucky Distribution Center ("the KDC"). Kroger and the Teamsters Kroger National Negotiating Committee, which represented Local 89 and five other local IBT affiliates, negotiated a collective bargaining agreement governing the industrial relations between the unions and Kroger ("the Master Agreement"), which by its terms is in effect from September 11, 2005, through September 10, 2011. Pursuant to the Master Agreement, Kroger and Local 89 also executed a supplemental agreement to govern specific issues at the KDC ("the Local Supplement"), which runs concurrently with the Master Agreement.

The Master Agreement specifically addresses arbitration, subcontracting, and termination of the contract. Article 8 establishes dispute-resolution procedures, which culminate in binding arbitration. These grievance procedures, including the final step

of arbitration, cover "any grievance[,] dispute[,] or complaint over the interpretation or application of the contents of [the Master] Agreement" raised by "any employee." (District Court Record Entry ("R.E.") 65-3, at 15.)

Article 25 of the Master Agreement addresses subcontracting. Under Section 25.1, Kroger has the right to subcontract work assigned to the collective bargaining unit but is prohibited from subcontracting such work "for the purpose of circumventing the terms and provisions" of the Master Agreement to an outside company that does not provide similar wages and conditions of employment. Section 25.3, entitled "Continuity of Employment," provides that if Kroger decides to contract out its entire KDC warehouse or transportation operations, or both, during the term of the agreement, "then a condition of such subcontract shall be offers of employment to eligible employees (as defined in Appendix I), by the new employer, provided that the new employer requires that number or more to perform such services." (R.E. 65-4 at 4.) Appendix I, which outlines additional job-security provisions, defines "eligible employees" as "all employees who have continuously been on a regular seniority list for at least three (3) years as of December 12, 2005." (*Id.* at 12.) This appendix also requires Kroger to offer comparable employment at the nearest similar facility covered by the Master Agreement to any eligible employee "who is permanently laid-off before September 11, 2011, as a direct result of [Kroger] transferring, subcontracting or closing all or part of any distribution center or manufacturing plant operation covered by a Local Supplement to this Agreement." (*Id.*) Appendix I explicitly subjects disputes over its interpretation and application to the arbitration provisions in the Master Agreement.

Finally, Article 36 of the Master Agreement addresses contract termination. Section 36.1, entitled "Effective Dates," states that the agreement "is effective from September 11, 2005 through September 10, 2011 and year to year thereafter," unless one of the parties—through its designated negotiating committee—notifies the other party of its desire to terminate or modify the agreement in writing at least 120 days before September 10, 2011. (*Id.* at 11.) Section 36.2, entitled "Notice to Terminate or Modify," requires that if either party wishes to terminate or modify the Local

Supplement, that party must give the other party notice ninety days prior to September 11, 2011.

## B.  Kroger Subcontracts to Transervice and Zenith

In October 2006, Kroger announced that it would subcontract out its KDC warehouse and transportation operations.  Kroger contracted with Transervice Logistics Inc. ("Transervice") for transportation operations and with Zenith Logistics Inc. ("Zenith") for warehouse operations.  On February 15, 2007, Kroger transferred the transportation operations to Transervice, and Transervice hired all of Kroger's KDC transportation employees.  On February 22, 2007, Kroger transferred the warehouse operations to Zenith, and Zenith hired all of Kroger's KDC warehouse employees.  Since that date, Kroger has not directly employed any members of Local 89.

Following Kroger's October 2006 announcement, Local 89 entered into negotiations with Transervice, Zenith, and Kroger, respectively.  In April 2007, Local 89's negotiations regarding new collective bargaining agreements with Transervice and Zenith broke down, and Local 89 struck Transervice and Zenith on April 18 and 19.  Subsequently, Local 89 and Kroger entered into an agreement ("the Letter of Understanding"), which was to go into effect only if Local 89 entered into ratified labor agreements with Transervice and Zenith and which, like the Master Agreement, is set to expire on September 10, 2011.  Local 89 subsequently entered into separate collective bargaining agreements with Transervice and Zenith.

## C.  The Letter of Understanding

The Letter of Understanding addresses outstanding grievances under the Master Agreement, the provision of retiree health benefits, and future changes to Kroger's subcontracting policies at the KDC.  In regards to grievances, Local 89 agreed to withdraw several outstanding grievances, including ones it had filed alleging that Kroger's subcontracting to Transervice and Zenith violated the subcontracting provisions included in Article 25 of the Master Agreement.  Also, Kroger agreed to make certain pension contributions and pay settlements based on specified past

grievances.  Finally, the parties agreed that "Kroger will meet with Teamsters Local 89 and either resolve any outstanding grievances resulting from their employment with Kroger or permit the grievance to proceed through the Kroger Master Grievance Process."  (R.E. 65-12, at 2.)  The Letter of Understanding does not address future grievances explicitly.

Regarding retiree health benefits, Kroger agreed to require any successors to Transervice and Zenith to provide retiree health coverage to employees (and their eligible dependants) who retire before September 10, 2011, comparable to the coverage provided under the Master Agreement.  Kroger also "agree[d] to continue the current practice of providing retiree health care for already retired former employees from the operations that were transferred."  (*Id.* at 1.)

Finally, in regards to future changes to Kroger's KDC subcontracting arrangements, the Letter of Understanding states:

> If between the date of this Agreement and September 10, 2011, Kroger determines to terminate either of its agreements with Transervice or Zenith and to retransfer or subcontract the work then being performed in, at or from the [KDC] including without limitation all inside or driving work to any third party different from Transervice or Zenith, then Kroger will require that all terms of this Letter of Understanding and the job security provisions of the [Transervice and Zenith labor agreements] . . . shall be a condition of the retransfer or resubcontracting to any third parties. . . .  Such retransfer or resubcontracting shall not take place absent the assumption of the terms of this Letter of Understanding by such third parties.  If at any time Kroger should decide to discontinue the subcontracting or transfer of all or any portion of the work subject to this Agreement and reassume such operations as the employer, Kroger agrees to directly employ all bargaining unit members then performing the reassumed work.  Such employees shall be covered by the Kroger Master Agreement bargaining unit.   The terms and conditions of their employment will be governed by the Master Agreement, and the Local 89 Supplement covering such employees.

(*Id.* at 1-2.)

**D. Grievances Regarding Further Subcontracting**

Sometime after the Letter of Understanding was executed, Local 89 discovered that Kroger was subcontracting out work previously done by Local 89 members to companies other than Transervice and Zenith, who were not subject to a collective bargaining agreement. On May 9, 2007, Local 89 filed a formal class-action grievance alleging that Kroger violated Article 25 of the Master Agreement and a provision included in a side agreement attached as an addendum to the Local Supplement that addresses which drivers are given priority when extra deliveries are needed. The grievance alleges that Kroger is violating these provisions "by subcontracting work to third party drivers while bargaining unit drivers and mechanics are available." (R.E. 1-4.) Kroger responded in a letter dated May 14, 2007, refusing to process the grievance. The letter stated that, "Kroger and Local 89 no longer have a collective bargaining relationship or a grievance procedure. Local 89 does not represent any Kroger employees." (R.E. 1-5.) Further, because the alleged violations took place after the transfer of operations to Transervice, Kroger claimed that they "cannot constitute a violation by Kroger of the Master Agreement or local supplement." (*Id.*) On August 24, 2007, Local 89 filed a second class-action grievance, stating that the it had learned that "Kroger was subcontracting bid runs and wheel runs to a[n] outside carrier that [is] head hauling loads out of the [KDC] to different stores in the region." (R.E. 25-1.) Local 89 alleged that this violated the same provisions of the Master Agreement and Local Supplement. Kroger again responded by letter, dated August 27, 2007, refusing to process the grievance and stating that "the matters complained about in the August 24, 2007 grievance are not subject to the grievance and arbitration provisions of the Master Agreement or local supplement." (R.E. 25-2.)

**E. Procedural History**

On July 6, 2007, after only the first grievance and response had been sent, Local 89 filed a complaint in district court to compel arbitration under the U.S. Arbitration Act, 9 U.S.C. § 1 *et seq.*, and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. On August 6, 2007, Kroger filed counterclaims against Local 89 and IBT,

alleging breach of contract and violation of the secondary boycott law, 29 U.S.C. § 158(b)(4)(ii)(B).  On September 20, 2007, Local 89 filed an amended complaint seeking to compel arbitration of both grievances or, in the alternative, award Local 89 damages based on Kroger's alleged breach of contract.

Cross-motions for summary judgment were filed on all of the claims.  The district court concluded that the Letter of Understanding fell within the scope of the Master Agreement's arbitration clause, and therefore compelled arbitration of Local 89's claims. Accordingly, the district court declined to analyze Local 89's alternative argument that Kroger breached the Letter of Understanding by hiring subcontractors other than Transervice and Zenith.  As for Kroger's secondary-boycott counterclaims, the court found that Kroger had put forth sufficient evidence to survive summary judgment as to Local 89, but granted IBT summary judgment.

Following the district court's summary-judgment order, Kroger filed a motion for entry of partial judgment under Federal Rule of Civil Procedure 54(b) on Local 89's claims to compel arbitration.  On August 13, 2009, the district court granted Kroger's motion for entry of partial judgment under Rule 54(b), permitting Kroger to appeal the arbitration decision without waiting for the secondary-boycott counterclaim against Local 89 to be resolved.  We have jurisdiction over Kroger's appeal under 28 U.S.C. § 1291.

## II.  ANALYSIS

### A.  Standard of Review

This Court reviews de novo the district court's grant of summary judgment. *United Steelworkers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277 (6th Cir. 2007).  "Similarly, we review de novo the district court's decision to compel arbitration of a particular dispute."  *Id.* (citing *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 311 (6th Cir. 2000)).  In this context, "[w]e must determine whether the dispute is arbitrable, meaning that a valid agreement to arbitrate exists between the parties and that

the specific dispute falls within the substantive scope of the agreement." *Landis v. Pinnacle Eye Care, Inc.*, 537 F.3d 559, 561 (6th Cir. 2008).

## B. Arbitrability of Dispute

Kroger argues that the district court erred in compelling arbitration of Local 89's grievances because the employer-employee relationship between Kroger and the Local 89 members terminated in February 2007 when it subcontracted its operations to Transervice and Zenith and, therefore, those employees are not eligible to invoke the Master Agreement grievance procedures. Kroger also argues that the Letter of Understanding is evidence that the Master Agreement's grievance procedures have ceased to apply and that any grievances arising under the Letter of Understanding fall outside the scope of the Master Agreement's arbitration provision. We do not find any of these arguments to be persuasive and conclude that Kroger has failed to overcome the presumption in favor of arbitrability.

### 1. *Scope of arbitration clause and presumption of arbitrability*

In *United Steelworkers of America v. Mead Corp., Fine Paper Division*, 21 F.3d 128 (6th Cir. 1994), this Court noted the well-established principles for determining whether a grievance is subject to compulsory arbitration:

> (1) a party cannot be forced to arbitrate any dispute that it has not obligated itself by contract to submit to arbitration; (2) unless the parties clearly and unmistakably provide otherwise, whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is an issue for judicial determination; (3) in making this determination, a court is not to consider the merits of the underlying claim; and (4) where the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."

*Id.* at 131 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)). Elsewhere, this Court has stated that, "[i]n deciding the arbitrability of a dispute, we begin with the presumption that national labor policy favors arbitration."

*Cooper*, 474 F.3d at 277. "The presumption favoring arbitration is based on a policy recognizing arbitration as a substitute for industrial strife and on the belief that arbitrators, more so than the courts, possess the proper experience and expertise to resolve labor disputes." *Id.* at 278 (citation and internal quotation marks omitted). "Moreover, in cases involving broad arbitration clauses the [Supreme] Court has found the presumption of arbitrability 'particularly applicable,' and only an express provision excluding a particular grievance from arbitration or 'the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" *Mead*, 21 F.3d at 131 (quoting *AT&T*, 475 U.S. at 650).

The arbitration clause included in the Master Agreement is broad, and therefore we apply a strong presumption of arbitrability in evaluating Local 89's grievances. Section 8.1 applies the grievance procedures, including arbitration if necessary, to "any grievance[,] dispute[,] or complaint over the interpretation or application of the contents of this Agreement" raised by "any employee." (R.E. 65-3, at 15.) This Court has interpreted similar provisions as "broad" arbitration clauses particularly subject to the presumption in favor of arbitrability. *See Int'l Ass'n of Machinists and Aerospace Workers v. ISP Chems., Inc.*, 261 F. App'x 841, 846 (6th Cir. 2008) (finding a clause providing for arbitration of "any difference of opinion or dispute . . . regarding interpretation or application of any provision of this Agreement," but with three specific issues excepted, to be broad); *Cooper*, 474 F.3d at 279 (finding a provision providing for arbitration of "any dispute . . . as to the interpretation or application of this Agreement" to be broad); *Cleveland Elec. Illuminating Co. v. Util. Workers Union of Am.*, 440 F.3d 809, 814-15 (6th Cir. 2006) (finding a clause providing for arbitration of "any disagreement concerning the interpretation or application of this Agreement" to be broad); *Mead*, 21 F.3d at 132 (finding a clause providing for arbitration of "grievances charging that the Company has violated this Agreement and involving the interpretation of, or compliance with, this Agreement" to be broad). Moreover, there are no issues excepted from the arbitration provision in the Master Agreement, the Local Supplement, or the Letter of Understanding. Further, the grievances concern an issue—subcontracting—specifically addressed in the Master Agreement and the Letter

of Understanding.  Thus, Kroger can  prevail in its attempt to exclude these grievances from arbitration only by presenting "the most forceful evidence of a purpose to exclude the claim[s] from arbitration."  *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 585 (1960).

A comparison to the facts of *Warrior & Gulf*, one of the *Steelworkers Trilogy* cases,[1] is instructive.  In that case, the employer refused to arbitrate a grievance filed by the union after union members were laid off because the employer began contracting out maintenance work previously done by union employees.  *Id.* at 575.  The arbitration clause at issue specifically excluded "matters which are strictly a function of management."  *Id.* at 576.  The employer argued that its decision to contract out work was strictly a management function and therefore not subject to arbitration.  *Id.* at 584.  The Supreme Court disagreed, stating that "[c]ontracting out work is the basis of many grievances; and that type of claim is grist in the mills of the arbitrators."  *Id.* at 584.  The Court also noted that a specific collective bargaining agreement or a written collateral agreement could exclude subcontracting claims from the grievance procedures or arbitration, but because there were no such exclusions, and the employer made no showing that contracting out fit within the management-function exception, the grievance was arbitrable.  *Id.* at 584-85; *see also id.* at 583 (holding that "[d]oubts" about whether a grievance is covered by an arbitration clause "should be resolved in favor of coverage").

Kroger briefly argues that the presumption in favor of arbitrability does not apply because (1) only the Master Agreement, and not the Letter of Understanding, contains an arbitration provision and (2) the policy reasons underlying the presumption are not applicable here because the Local 89 members are no longer Kroger employees.  Neither of these arguments is persuasive.  In *Cooper*, this Court rejected the argument that the presumption "is not applicable to side agreements that . . . do not contain a separate

---

[1] "In 1960, the Supreme Court issued three decisions designed to end the federal courts' hostility to labor-arbitration awards."  *Mich. Family Res., Inc. v. Serv. Employees Int'l Union Local 517M*, 475 F.3d 746, 750 (6th Cir. 2007) (en banc).  These cases later became known as the *Steelworkers Trilogy*.  *See id.* at 750-51.

arbitration clause." *Cooper*, 474 F.3d at 278 n.8. This Court found that a dispute that "involve[d] whether [the main collective bargaining agreement that contained an arbitration clause] creates a duty for the parties to arbitrate their dispute over the [side agreement]" was "exactly the type of dispute where the presumption favoring arbitrability is to be applied; the fact that the grievance is over a side letter is of little consequence." *Id.* Moreover, on their face, the grievances that Local 89 seeks to arbitrate allege violations of the Master Agreement and Local Supplement, not the Letter of Understanding. The *Cooper* employer also argued that the policy reasons undergirding the presumption in favor of arbitration—that arbitration is a substitute for industrial strife and that arbitrators have special expertise regarding labor disputes—did not apply because all of the class members of the lawsuit were non-union member retirees and survivors. *Id.* at 281. This Court rejected this argument as well, concluding that even though none of the class members were current employees, "the Union still has an interest in resorting to economic weapons in order to maintain the integrity of the bargaining process." *Id.*; *see also Cleveland*, 440 F.3d at 815-16.

Based on this analysis, we conclude that the Master Agreement's arbitration provision is broad, and the presumption in favor of arbitrability is particularly applicable to Local 89's grievances. Thus, Kroger must present "the most forceful evidence of a purpose to exclude the claim from arbitration" to prevail. *Warrior & Gulf*, 363 U.S. at 585. Based on the following analysis, we further conclude that Kroger has failed to meet this burden.

### 2. *Effect of subcontracting to Transervice and Zenith*

Kroger presents a series of arguments claiming that Local 89's grievances are not subject to arbitration because when Kroger subcontracted out all of its KDC operations in February 2007, the arbitration provision "ceased to apply." (*See, e.g.*, Kroger Br. 22.) To the extent that Kroger's argument is coterminous with an argument that the parties' agreement to arbitrate has expired or has been terminated, it fails because "where the dispute turns not on whether the parties ever agreed to arbitrate, but rather whether an agreement to arbitrate has expired or terminated, the question of termination is for the

arbitrator." *Int'l Ass'n of Bridge, Structural, and Ornamental Iron Workers, Local Union No. 44 v. J & N Steel & Erection Co.*, 8 F. App'x 381, 386 (6th Cir. 2001); *cf. Cooper*, 474 F.3d at 280 ("[T]he Supreme Court has recognized that a party's obligation to arbitrate does not automatically cease upon termination of the collective bargaining agreement." (internal quotation marks omitted)). "The reason an arbitrator, not the court, should decide whether an arbitration agreement has expired or terminated is because resolution of the issue involves examining and interpreting the termination provisions of the agreement." *J & N*, 8 F. App'x at 386.

However, Kroger attempts to distinguish its position, stating that it is not arguing that the Master Agreement (or the arbitration provision) has expired or terminated, but rather that no Local 89 members can invoke its provisions because they are no longer employees of Kroger. In making this argument, Kroger relies chiefly upon *Fraser v. Magic Chef-Food Giant Markets, Inc.*, 324 F.2d 853 (6th Cir. 1963). In that case, the employer and the union were one year into a three-year collective bargaining agreement when the employer notified the union that it would be closing the plant where the union members worked within two months "because of its inability to obtain adequate profits." *Id.* at 855 (internal quotation marks omitted). The covered employees filed suit to obtain the wages that they would have received had the plant continued to operate throughout the duration of the contract. *Id.* This Court refused to read into the contract an affirmative duty on behalf of the employer to stay in business or to treat the collective bargaining agreement as an employment contract because "[r]ights of employees under a collective bargaining agreement presuppose an employer-employee relationship" that a collective bargaining agreement does not create. *Id.* at 856. Further, this Court stated that "[e]mployees' rights under such a contract do not survive a discontinuance of business and a termination of operations." *Id.*

Unfortunately for Kroger, *Fraser* does not apply here. First, *Fraser* did not involve arbitration. The former employees in *Fraser* did not sue to compel arbitration, they sued to collect contract damages as if the collective bargaining agreement was an employment contract. Therefore, *Fraser* addressed the merits of the employees' contract

claims against their employer. Here, in contrast, our role is to determine whether the Master Agreement's arbitration clause is susceptible to an interpretation whereby it would cover Local 89's grievances. *Fraser* is best understood as standing for the proposition that employment contracts are distinct from collective bargaining agreements and the latter cannot be enforced as if they were the former, an issue irrelevant to the case before us. Second, even if *Fraser*'s holding were applicable here, it is factually distinguishable. The employer in *Fraser* closed the entire plant covered by the collective bargaining agreement, while Kroger simply subcontracted out its operations at the KDC to other companies. *See Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1123 (6th Cir. 1981) (distinguishing *Fraser* because the employees' terminations were precipitated by the merger of their employer with another company, not because their employer went out of business). Further, the collective bargaining agreement in *Fraser* did not address cessation of operations at the plant, while the Master Agreement specifically addresses the possibility of Kroger contracting out its KDC operations. Nowhere in the Master Agreement, the Local Supplement, or the Letter of Understanding does it state that Kroger's subcontracting out of its KDC operations limits the applicability of the arbitration provision.

Moreover, an examination of the job-security provisions included in the Master Agreement further demonstrates the untenability of Kroger's position. Under Section 25.3, if Kroger subcontracts all of its warehouse or transportation operations during the term of the agreement, "then a condition of such subcontract shall be offers of employment to eligible employees . . . by the new employer, provided that the new employer requires that number or more to perform such services." (R.E. 65-4, at 4.) Under Appendix I, Kroger is required to offer a "comparable job at the nearest like facility" covered by the Master Agreement to any employee "permanently laid-off" because Kroger subcontracted out all or part of its KDC operations. (*Id.* at 12.) These provisions provide protections to *former* Kroger employees who lost their positions at Kroger because Kroger subcontracted out its KDC operations. To hold that these employees are ineligible to grieve complaints about Kroger subcontracting out its KDC operations because they are no longer employed by Kroger requires a circular logic.

Further, such a holding essentially would create a blanket exception of subcontracting-related claims from the Master Agreement's arbitration provision because, once the subcontracted-out employees were off Kroger's payroll, there would be no one eligible to file a grievance. This Court has no authority to write such a sweeping exception into the Master Agreement when, by its terms, the arbitration provision covers "any grievance[,] dispute[,] or complaint over the interpretation or application of the contents of [the Master] Agreement." (R.E. 65-3, at 15.) Finally, even if we were to find that there was no particular Local 89 member eligible to grieve Kroger's subcontracting activities, the Union itself has an interest in enforcing the terms of the Master Agreement "in order to maintain the integrity of the bargaining process." *Cooper*, 474 F.3d at 281; *cf. Cleveland*, 440 F.3d at 816 (finding dispute over retiree benefits was arbitrable because the union specifically had bargained for such benefits and despite the fact that retirees had other remedies available).

### 3. Effect of Letter of Understanding

Kroger also argues that the parties' execution of the Letter of Understanding demonstrates their intent to exclude any subsequent grievances from the Master Agreement's arbitration provisions. Kroger notes that the Letter of Understanding specifically provides for arbitration of outstanding grievances under the Master Agreement (but not subsequent grievances) and that Local 89 included provisions specifically providing for arbitration of subsequent grievances in earlier draft agreements. Further, Kroger argues that the Letter of Understanding is not a "side letter" or "side agreement" under *Cooper* and that, even if it is, Local 89's grievances fall outside of the scope of the arbitration provision because they have not been brought by current Kroger employees. We similarly are unpersuaded by this set of arguments.

First, given the presumption in favor of arbitrability, the fact that the Letter of Understanding addresses the arbitrability of outstanding grievances but is silent as to subsequent grievances should not be read as excluding such grievances from the arbitration provisions. To hold otherwise would be to reverse the presumption. *See Mead*, 21 F.3d at 131 (holding that courts "should not deny an order to arbitrate 'unless

it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute'"). Similarly, the fact that earlier proposed agreements drafted by Local 89 specifically provided for arbitration of subsequent grievances is not strong enough evidence to rebut the presumption of arbitrability. Notably, the arbitration provisions in these proposed agreements do not just provide that grievances arising from the agreement will be subject to the Master Agreement's grievance procedures, they provide that such grievances will be subjected to an *expedited* arbitration process. Therefore, the absence of such a provision in the Letter of Understanding can just as easily support the implication that both parties understood subsequent grievances would be subject to the Master Agreement's arbitration provision, but that they ultimately agreed not to subject such grievances to *expedited* arbitration. Given the presumption in favor of arbitration, the fact that the agreement is susceptible to a reading that provides for arbitration controls.

Kroger also argues that disputes over the Letter of Understanding are not arbitrable because it is not a side agreement and, even if it were, disputes arising under the Letter of the Agreement fall outside of the scope of the Master Agreement's arbitration provision.[2] In *Cooper*, this Court adopted the "scope test," also applied by the Third, Seventh, and Ninth Circuits, to determine whether a dispute over a side agreement without an arbitration clause is subject to an arbitration clause included in the main collective bargaining agreement. *Cooper*, 474 F.3d at 279. Under this test, "unless the parties indicate otherwise, disputes over a side agreement are arbitrable if the subject matter of the side agreement is within the scope of the [collective bargaining agreement's] arbitration clause."[3] *Id.* at 278-79. Our inquiry under the scope test

---

[2] We note that the two grievances that Local 89 seeks to compel to be arbitrated in its amended complaint do not allege violations of the Letter of Understanding; they allege violations of the Master Agreement and Local Supplement. Thus, the question of whether disputes arising under the Letter of Understanding are arbitrable is of questionable relevance. However, although they are not referenced in Local 89's amended complaint, there are similar, subsequently filed grievances in the record alleging that Kroger has violated the Letter of Understanding. Further, Local 89 argues in its brief that its grievances invoke the Letter of Understanding, in addition to the Master Agreement and Local Supplement.

[3] Under the "collateral test," employed by the Second, Fourth, and Eighth Circuits, "courts consider the similarity of the side agreement's subject matter to the subject matter of the [collective bargaining agreement]." *Cooper*, 474 F.3d at 278. If the subject matter is dissimilar, the side agreement is deemed collateral to the collective bargaining agreement, and therefore not arbitrable. "However, where

"focuses on the breadth of the arbitration clause, thereby permitting parties to reference the plethora of case law interpreting arbitration clauses . . . . Simply put, 'the general arbitration clause will apply to a dispute over a side agreement to the same extent it would govern any other disagreement between the parties.'" *Id.* at 280 (quoting *Inlandboatmens Union of the Pac. v. Dutra Group*, 279 F.3d 1075, 1081 (9th Cir. 2002)).

Applying the scope test in *Cooper*, this Court noted that the side agreement "concern[ed] retirement healthcare contribution caps," and while the main collective bargaining agreement did not address this narrow issue, "references to medical benefits generally, and healthcare coverage of retired employees, [we]re replete" throughout the main agreement. *Id.* at 279. Given that the main agreement contained a broad arbitration clause and neither it nor the side agreement contained any exceptions from arbitrability, this Court concluded that the side agreement "clearly falls within [the arbitration clause's] scope." *Id.* at 280. The *Cooper* opinion also set forth how parties can ensure that potential side-agreement disputes do not become subject to arbitration:

> Should a party intend not to arbitrate disputes over a particular side agreement, language to that effect may be included within the side agreement. Moreover, if the parties wish to restrict the [collective bargaining agreement's] arbitration clause from applying to side agreements, they can provide for such within the language of the [collective bargaining agreement].

*Id.*

Kroger first argues that the Letter of Understanding does not qualify as a "side agreement." Kroger notes that, unlike that side agreement in *Cooper*, the Letter of Understanding was not negotiated simultaneously with the Master Agreement and was never appended to the Master Agreement. However, *Cooper* imposes no such requirements in order to consider a particular contract to be a side agreement, nor does

---

the side agreement is 'integral' to the [collective bargaining agreement], courts permit arbitration of disputes over its provisions." *Id.* In declining to adopt the collateral test, this Court stated that it "creates uncertainty because parties have no gauge as to when a side agreement is similar or dissimilar to the underlying [collective bargaining agreement]." *Id.* at 280.

Kroger provide any other authority for such a rule.  More generally, Kroger argues that the Letter of Understanding was negotiated to wrap up the relationship between it and Local 89 rather than further clarify an ongoing collective bargaining relationship between the two parties.  But the Letter of Understanding nowhere states that the Master Agreement or its grievance procedures no longer apply, nor does it comply with the contract termination or modification requirements set forth in the Master Agreement.  Further, the fact that it addresses Kroger's ongoing duties and obligations under the Master Agreement is evidence to the contrary.

Kroger next argues that, even if the Letter of Understanding is a side agreement, disputes concerning it do not qualify for arbitration under the scope test.  Under that test, we first must look to the arbitration provision, and then "[w]ith the scope of the arbitration clause in mind, . . . look to the subject matter of the side agreement to determine if it falls within the clause's intended coverage."  *Id.* at 279.  As noted above, the scope of the arbitration provision is broad and there is no language in the Letter of Understanding excluding any types of grievances from arbitration.  Likewise, there is nothing in the Master Agreement's grievance procedures that limits their applicability to side agreements.  Further, the Letter of Understanding deals almost exclusively with issues falling within the scope of the Master Agreement.  To the extent that Local 89 has grievances arising out of the Letter of Understanding, they concern subcontracting, addressed specifically in Article 25 of the Master Agreement.  Given the broadness of the arbitration clause, there is no question that grievances concerning subcontracting fall within its scope.

In sum, we find that neither Kroger's subcontracting to Transervice and Zenith (and the consequent fact that Kroger no longer directly employs Local 89 members) nor the parties' execution of the Letter of Understanding demonstrates an intent to exclude Local 89's subcontracting grievances from arbitration under the Master Agreement.  We conclude that Kroger has failed to rebut the presumption in favor of arbitrability and the district court correctly compelled arbitration.

## III.  CONCLUSION

Based on the foregoing analysis, we **AFFIRM** the judgment of the district court.